**GIRARD SHARP LLP**
Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
Kyle P. Quackenbush (SBN 322401)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
dsharp@girardsharp.com
apolk@girardsharp.com
kquackenbush@girardsharp.com

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Dean Santos, Lesia Dunn, and Kimberly Ann Marckmann, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>National Football League, Inc., National Football League Properties, Inc., NFL Enterprises, LLC, Arizona Cardinals Football Club LLC, Atlanta Falcons Football Club, LLC, Baltimore Ravens Limited Partnership, Buccaneers Team LLC, Buffalo Bills LLC, Carolina Panthers, LLC, The Chicago Bears Football Club, Inc., Chargers Football Company, LLC, Cincinnati Bengals, Inc., Cleveland Browns Football Company, LLC, Dallas Cowboys Football Club, Ltd., Detroit Lions Inc., Football Northwest LLC, Green Bay Packers, Inc., Houston NFL Holdings, L.P., Indianapolis Colts, Inc., Jacksonville Jaguars LLC, Kansas City Chiefs Football Club, Inc., Las Vegas Raiders Football LLC, Miami Dolphins Ltd., Minnesota Vikings Football LLC, New England Patriots LLC, New Orleans Louisiana Saints, LLC, New York Football Giants Inc., New York Jets Football Club, Inc. PDB Sports, Ltd. d/b/a Denver Broncos Football Club, The Philadelphia Eagles Football | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1    Club Inc., Pittsburgh Steelers Sports Inc., The
     Rams Football Company LLC, San Francisco
2    Forty Niners II, LLC, Tennessee Football, Inc.,
     Washington Football, Inc., and Fanatics, Inc.,
3
4            Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   CLASS ACTION COMPLAINT
     CASE NO.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   PARTIES .............................................................................................................. 4

      A.    Plaintiffs ................................................................................................... 4

      B.    Defendants ................................................................................................ 4

            1.    NFL Defendants ............................................................................. 4

            2.    Fanatics ........................................................................................... 9

III.  AGENTS AND CO-CONSPIRATORS ............................................................. 10

IV.   JURISDICTION AND VENUE ........................................................................ 11

V.    CLASS ACTION ALLEGATIONS ................................................................... 13

      A.    Class Definition ...................................................................................... 13

      B.    Class Certification Requirements Under Rule 23 ................................... 14

VI.   INDUSTRY BACKGROUND .......................................................................... 18

      A.    The NFL and Fanatics ............................................................................ 18

      B.    Third-Party Online Marketplaces ("TPOMs") ...................................... 20

VII.  FACTUAL ALLEGATIONS ............................................................................. 23

      A.    Defendants Agreed to Boycott Retailers Selling NFL Licensed
            Products Through TPOMs. ..................................................................... 23

      B.    Fanatics Prohibited its Suppliers from Selling to its Competitors. ........... 32

      C.    Defendants Conspired Through Domain Name Licensing. ....................... 35

      D.    Defendants Prohibit Competing Retailers from Using NFL-Related
            Keywords in Online Advertising. ........................................................... 38

      E.    Non-Economic Evidence Supports the Existence of a Conspiracy. .......... 39

      F.    Economic Evidence Supports the Existence of a Conspiracy. ................. 43

            1.    Defendants' Prices Increased Over the Conspiracy Period. ............ 44

i

CLASS ACTION COMPLAINT
CASE NO.

2.     Defendants' Conduct Ran Counter to Their Own Economic Self-Interests in the Absence of a Conspiracy...............................44

VIII.    ANTICOMPETITIVE EFFECTS AND LACK OF PRO-COMPETITIVE JUSTIFICATIONS .......................................................................46

A.     Defendants' Profited from their Anticompetitive Conduct. .....................46

B.     Defendants' Scheme has had Significant Anticompetitive Effects. ..........47

C.     There Are No Procompetitive Justifications for Defendants' Collusion. .................................................................................................48

D.     Defendants' No TPOM Sellers, No Online Retailers, and No NFL Keywords Policies Violate Antitrust Law. .................................................52

E.     The Conspiracy has Harmed Plaintiffs and the Members of the Class. .......................................................................................................54

IX.    MARKET DEFINITION AND MARKET POWER ...........................................55

A.     A Distinct Market Exists for Online Sales of New NFL Licensed Products...................................................................................................55

1.     Online vs. Brick and Mortar.........................................................55

2.     NFL Licensed Products vs. Other Products. ................................59

3.     New vs. Vintage. ..........................................................................61

B.     Competition Amongst Defendants............................................................62

C.     Defendants Dominate the Market for Online Sales of New NFL Licensed Products. ...................................................................................63

X.     INJUNCTIVE RELIEF IS APPROPRIATE TO RESTORE COMPETITION TO THE MARKETPLACE.......................................................67

XI.    STATUTES OF LIMITATION ARE TOLLED. ................................................68

A.     Discovery Rule.........................................................................................68

B.     Fraudulent Concealment ..........................................................................69

XII.    COUNT ONE: VIOLATION OF SHERMAN ACT § 1 AND THE CLAYTON ACT. .............................................................................................70

XIII.    COUNT TWO: VIOLATION OF SHERMAN ACT § 2......................................72

ii

CLASS ACTION COMPLAINT
CASE NO.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

XIV.   COUNT THREE: INJUNCTIVE RELIEF UNDER 15 U.S.C. § 26. ...................74

XV.    DEMAND FOR JURY TRIAL ..............................................................................75

CLASS ACTION COMPLAINT
CASE NO.

## I.     INTRODUCTION

1.     The National Football League ("NFL") is big business—in 2020 alone, the 32 teams that make up the NFL made approximately $12.2 billion collectively, a low figure compared to recent years due to the impact of the coronavirus pandemic on ticket sales.[1] The NFL derives this revenue from various sources, including ticket sales, media deals, concessions, and importantly for this case, merchandise sales.

2.     Each of the 32 Teams sells merchandise emblazoned with their team's intellectual property, such as their names and logos ("NFL Licensed Products"). For example, the Dallas Cowboys have the blue star, and the Las Vegas Raiders have the helmeted pirate.

 

3.     In a competitive market, each Team would compete to sell NFL Licensed Products to the greatest number of fans—not only to realize profit but as a self-serving marketing tool; fans wearing NFL License Products are walking billboards.

4.     Instead, all the Teams pool their intellectual property with the National Football League Properties, Inc. ("NFLP"), a subsidiary of the NFL that is responsible for collectively licensing the Teams' and the NFL's intellectual property. The NFLP accordingly operates as a walking horizontal conspiracy among competitors formed for the very purpose of organizing group-wide agreements between Teams that otherwise would compete among themselves to license their trademarks to competing manufacturers and retailers.

---

[1] *National Football League revenue by team in 2020*, Statista, https://www.statista.com/statistics/193553/revenue-of-national-football-league-teams-in-2010/ (last accessed Feb. 2, 2022).

CLASS ACTION COMPLAINT
CASE NO.

5.      One such manufacturing and retailer is Fanatics, Inc. This "full-scale global digital sports platform" began in earnest in 2011, when Michael Rubin—Fanatics' CEO— decided to focus his efforts on sports e-commerce business.[2] In 2017, the NFL purchased a three percent stake in Fanatics for $95 million.[3] This meant that as Fanatics' value increased, so too did the NFL's investment.

6.      For their mutual benefit, Defendants— the NFL and its affiliates,[4] each of the 32 Teams that participate in the NFL,[5] and Fanatics, Inc.—conspired to dominate the retail market for online sales of NFL Licensed Products. Defendants' conspiracy consists of at least four related components:

7.      *First*, Defendants colluded to boycott competing retailers who sold NFL Licensed Products through third-party online marketplaces ("TPOMs") like the Amazon Marketplace. This boycott eliminated Defendants' competitors who would have charged lower prices for NFL Licensed Products sold online. In so doing, the boycott removed the downward pressure on prices and margins that, absent the conspiracy, would have otherwise flowed directly from enhanced competition.

8.      *Second*, having greatly reduced the number of retailers in online marketplaces, Defendants conspired to fill the void by entering exclusive dealing arrangements that denied their competitors access to manufacturers and suppliers.

9.      *Third*, having solidified their dominant position in the online retail market for NFL Licensed Products, Defendants, rather than compete with one another, entered anticompetitive licensing agreements to further reduce competition.

---

[2] *See Our History*, Fanaticsinc.com, https://www.fanaticsinc.com/history.
[3] Darren Rovell, *NFL shells out $95 million for 3 percent stake in sports retailer*, ESPN (May 8, 2017), Fanaticshttps://www.espn.com/nfl/story/_/id/19337046/nfl-drops-95m-stake-fanatics
[4] Defendants National Football League, Inc., National Football League Properties, Inc., and NFL Enterprises, LLC.
[5] These defendants are named in Section III, *infra*.

2

CLASS ACTION COMPLAINT
CASE NO.

10.     *Fourth*, Defendants conspired to further undermine other retailers' ability to compete in the online market for NFL Licensed Products by forbidding those retailers from using NFL-related keywords to advertise or even describe their product offerings. The effect is to drive consumer traffic to Defendants' retail sites and product listings and away from those of competing retailers.

11.     Defendants entered into such agreements to increase profits and the valuation of Fanatics. As Fanatics executive chairman Michael Rubin stated, if NFL Licensed Products were commonly available through other retailers, "there'd be no reason for [Fanatics] to be."[6] In another interview, Rubin put an even finer point on it: "If your strategy is just to win on price, you're eventually going to die."[7]

12.     The conspiracy as a whole, and each individual part, have allowed Defendants to charge supracompetitive prices for NFL Licensed Products and share the monopoly profits among themselves. As NBA Commissioner Adam Silver puts it, Rubin "owns this marketplace in the sports industry."[8] Because of this conspiracy, Plaintiffs and the proposed class of direct online purchasers of NFL Licensed Products paid more than they otherwise would have for their purchases.

13.     Plaintiffs Dean Santos, Lesia Dunn, and Kimberly Ann Marckmann, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants to recover treble damages and the costs of this suit, including reasonable attorneys' fees, as well as for injunctive relief, pursuant to the Sherman Act (15 U.S.C. §§ 1–7) and the

---

[6] TC Video, *Fireside Chat with Michael Rubin: Disrupt SF 2018*, TechCrunch (Sept. 7, 2018), https://techcrunch.com/video/fireside-chat-with-michael-rubin-fanatics-disrupt-sf-2018/.
[7] Recode, *Full Interview: Adam Silver, NBA Commissioner, and Michael Rubin, Exec Chairman of Fanatics*, YouTube (Sept. 13, 2017), https://www.youtube.com/watch?v=TQx65nkEDPI&t=165s.
[8] Recode, *Full Interview: Adam Silver, NBA Commissioner, and Michael Rubin, Exec Chairman of Fanatics*, YouTube (Sept. 13, 2017), https://www.youtube.com/watch?v=TQx65nkEDPI&t=165s. *Id.*

CLASS ACTION COMPLAINT
CASE NO.

Clayton Act (15 U.S.C. §§ 12–27). All allegations herein other than those relating to Plaintiffs are based on information and belief.

## II.   PARTIES

### A.   Plaintiffs

11.   Plaintiff Dean Santos is and has been at all relevant times a resident and citizen of the state of Florida. Mr. Santos purchased NFL Licensed Products directly from Defendants during the Relevant Time Period. His purchases were for personal, family, or household use.

12.   Plaintiff Lesia Dunn is and has been at all relevant times a resident and citizen of the state of Texas. Ms. Dunn purchased NFL Licensed Products directly from Defendants during the Relevant Time Period. Her purchases were for personal, family, or household use.

13.   Plaintiff Kimberly Ann Marckmann is and has been at all relevant times a resident and citizen of the state of Texas. Ms. Marckmann purchased NFL Licensed Products directly from Defendants during the Relevant Time Period. Her purchases were for personal, family, or household use.

### B.   Defendants

#### 1.   NFL Defendants

14.   Defendant **National Football League, Inc.** (the "NFL") is an association of 32 professional football teams in the United States. Each of the NFL member teams, headquartered in various cities across the country, is separately owned and operated, acts in its own economic self-interest, and competes in many respects with the others. The NFL has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.

15.   Defendant **National Football League Properties, Inc.** ("NFLP") is a Delaware corporation with its principal place of business at 345 Park Avenue, New York, NY 10017, and was created by the NFL and its member teams. NFLP serves as the representative of the National Football League and its member professional football teams for the licensing of their trademarks and logos, which include, among others, the NFL shield, the words SUPER BOWL and PRO

4

CLASS ACTION COMPLAINT
CASE NO.

BOWL, the Super Bowl and Pro Bowl logos, and the Teams' names, nicknames, colors, symbols, emblems, helmet designs, and uniform designs. In addition to its New York location, Defendant NFLP maintains an office at 10950 Washington Blvd., Suite 100, Culver City, California 90232.[9]

16.     Defendant **NFL Enterprises, LLC** ("NFL Enterprises") is a Delaware limited liability company with its principal place of business at 280 Park Avenue, New York, NY 10017. According to publicly available information, NFL Enterprises owns the "NFLShop.com" domain name.

17.     Defendant **Arizona Cardinals Football Club LLC** is a Delaware limited liability company with its principal place of business at 8701 South Hardy Dr., Tempe, AZ 85284. The Arizona Cardinals are a professional football team and member of the NFL.

18.     Defendant **Atlanta Falcons Football Club, LLC** is a Georgia limited liability company with its principal place of business at 4400 Falcon Pkwy, Flowery Branch, GA 30542. The Atlanta Falcons are a professional football team and member of the NFL.

19.     Defendant **Baltimore Ravens Limited Partnership** is a Maryland limited partnership with its principal place of business at 1101 Russel St., Baltimore, MD 21230. The Baltimore Ravens are a professional football team and member of the NFL.

20.     Defendant **Buccaneers Team LLC** is a Delaware limited liability company with its principal place of business at 1 Buccaneers Pl., Tampa, FL 33607. The Tampa Bay Buccaneers are a professional football team and member of the NFL.

21.     Defendant **Buffalo Bills LLC** is a Delaware limited liability company with its principal place of business at 1 Bills Dr., Orchard Park, NY 14127. The Buffalo Bills are a professional football team and member of the NFL.

---

[9] *Nfl Properties LLC*, D&B Bus. Directory, https://www.dnb.com/business-directory/company-profiles.nfl_properties_llc.101f8c221a0154b21d3b78f972eda710.html (last visited December 18, 2021); *see also Nfl Properties LLC*, Buzzfile, https://www.buzzfile.com/business/Nfl-Network-310-840-4635 (last visited December 18, 2021).

CLASS ACTION COMPLAINT
CASE NO.

22.     Defendant **Carolina Panthers, LLC** is a North Carolina limited liability company with its principal place of business at 800 South Mint Street, Charlotte, NC 28202. The Carolina Panthers are a professional football team member of the NFL.

23.     Defendant **The Chicago Bears Football Club, Inc.** is a Delaware corporation with its principal place of business at 1000 Football Drive, Lake Forest, IL 60045. The Chicago Bears are a professional football team and member of the NFL.

24.     Defendant **Chargers Football Company, LLC** is a California limited liability company with its principal place of business at 3333 Susan St., Costa Mesa, CA 92626. The Los Angeles Chargers are a professional football team and member of the NFL.

25.     Defendant **Cincinnati Bengals, Inc.** is an Ohio corporation with its principal place of business at 1 Paul Brown Stadium, Cincinnati, OH 45202. The Cincinnati Bengals are a professional football team and member of the NFL.

26.     Defendant **Cleveland Browns Football Company, LLC** is a Delaware limited liability company with its principal place of business at 76 Lou Groza Blvd., Berea, OH 44017. The Cleveland Browns are a professional football team and member of the NFL.

27.     Defendant **Dallas Cowboys Football Club, Ltd.** is a Texas limited liability company with its principal place of business at 1 Cowboys Way, Ste. 100, Frisco, TX 75034. The Dallas Cowboys are a professional football team and member of the NFL.

28.     Defendant **Detroit Lions, Inc.** is a Michigan corporation with its principal place of business at 222 Republic Dr., Allen Park, MI 48101. The Detroit Lions are a professional football team and member of the NFL.

29.     Defendant **Football Northwest LLC** is a Washington limited liability company with its principal place of business at 12 Seahawks Way, Renton, WA 98056. The Seattle Seahawks are a professional football team and member of the NFL.

CLASS ACTION COMPLAINT
CASE NO.

30.    Defendant **Green Bay Packers, Inc.** is a Wisconsin corporation with its principal place of business at 1265 Lombardi Ave., Green Bay, WI 54304. The Green Bay Packers are a professional football team and member of the NFL.

31.    Defendant **Houston NFL Holdings, L.P.** is a Delaware limited partnership with its principal place of business at 2 NRG Park, Houston, TX 77054. The Houston Texans are a professional football team and member of the NFL.

32.    Defendant **Indianapolis Colts, Inc.** is a Delaware corporation with its principal place of business at 7001 West 56th St., Indianapolis, IN 46254. The Indianapolis Colts are a professional football team and member of the NFL.

33.    Defendant **Jacksonville Jaguars LLC** is a Florida limited liability company with its principal place of business at 1 TIAA Bank Field Dr., Jacksonville, FL 32202. The Jacksonville Jaguars are a professional football team and member of the NFL.

34.    Defendant **Kansas City Chiefs Football Club, Inc.** is a Texas corporation with its principal place of business at 1 Arrowhead Dr., Kansas City, MO 64129. The Kansas City Chiefs are a professional football team and member of the NFL.

35.    Defendant **Las Vegas Raiders Football LLC** are a Nevada limited liability company with its principal place of business at 1475 Raiders Way, Henderson, NV 89052. The Las Vegas Raiders (formerly the Oakland Raiders) are a professional football team and member of the NFL.

36.    Defendant **Miami Dolphins Ltd.** is a Florida limited company with its principal place of business at 347 Don Shula Dr., Miami Gardens, FL 33056. The Miami Dolphins are a professional football team and member of the NFL.

37.    Defendant **Minnesota Vikings Football LLC** is a Delaware limited liability company with its principal place of business at 2600 Viking Cr., Eagan, MN 55121. The Minnesota Vikings are a professional football team and member of the NFL.

CLASS ACTION COMPLAINT
CASE NO.

38.     Defendant **New England Patriots LLC** is a Delaware limited liability company with its principal place of business at 1 Patriot Pl., Foxboro, MA 02035. The New England Patriots are a professional football team and member of the NFL.

39.     Defendant **New Orleans Louisiana Saints, LLC** is a Delaware limited liability company with its principal place of business at 5800 Airline Dr., Metairie, LA 70003. The New Orleans Saints are a professional football team and member of the NFL.

40.     Defendant **New York Football Giants Inc.** is a New York corporation with its principal place of business at 1925 Giants Drive, East Rutherford, NJ 07073. The New York Giants are a professional football team and member of the NFL.

41.     Defendant **New York Jets Football Club, Inc.** is a Delaware corporation with its principal place of business at 1 Jets Drive, Florham Park, NJ 07932. The New York Jets are a professional football team and member of the NFL.

42.     Defendant **PDB Sports, Ltd d/b/a Denver Broncos Football Club** is a Colorado limited company with its principal place of business at 13655 Broncos Parkway, Englewood, CO 80112. The Denver Broncos are a professional football team and member of the NFL.

43.     Defendant **The Philadelphia Eagles Football Club Inc.** is a Delaware corporation with its principal place of business at 1 Novicare Way, Philadelphia, PA 19145. The Philadelphia Eagles are a professional football team and member of the NFL.

44.     Defendant **Pittsburgh Steelers Sports Inc.** is a Pennsylvania corporation with its principal place of business at 3400 S. Water St., Pittsburgh, PA 15203. The Pittsburgh Steelers are a professional football team and member of the NFL.

45.     Defendant **The Rams Football Company LLC** is a Delaware limited liability company with its principal place of business at 29899 Agoura Rd., Agoura Hills, CA 91301. The Los Angeles Rams are a professional football team and member of the NFL.

CLASS ACTION COMPLAINT
CASE NO.

46.     Defendant **San Francisco Forty Niners II, LLC** is a Delaware limited liability company with its principal place of business at 4900 Marie P DeBartolo, Santa Clara, CA 95054. The San Francisco 49ers are a professional football team and member of the NFL.

47.     Defendant **Tennessee Football, Inc.** is a Delaware corporation with its principal place of business at 460 Great Circle Rd., Nashville, TN 37228. The Tennessee Titans are a professional football team and member of the NFL.

48.     Defendant **Washington Football, Inc.** is a Maryland corporation with its principal place of business at 21300 Redskins Park Dr., Ashburn, VA 20147. The Washington Football Team is a professional football team and member of the NFL.

49.     This complaint uses the term "NFL Defendants" to refer collectively to the 32 NFL Teams, the NFL, NFLP, and NFL Enterprises.

## 2.     Fanatics

50.     Defendant **Fanatics, Inc.** is a Delaware corporation with a principal place of business at 1 Franklin Pkwy, Bldg. 910, San Mateo, CA 94403.[10] Fanatics is "co-headquartered in San Mateo[, California] and Jacksonville, Fl[orid]a.[11] Approximately 250 people, including

---

[10] *Contact Us*, Fanatics, https://fanaticsinc.com/ (last visited Dec. 18, 2021) (identifying the San Mateo office as Fanatics's "West Coast Innovation Center"); Mark Basch, *Fanatics Hires Nike Executive as new CFO*, Jacksonville Daily Rec. (Sept. 26, 2019), https://www.jaxdailyrecord.com/article/fanatics-hires-nike-executive-as-new-cfo (stating that Fanatics' CFO, Mich Chandlee, "will work from the company's West Coast headquarters in San Mateo").

[11] Scott Ard, *Silicon Valley in VR: Inside Fanatics' San Mateo Office*, Silicon Valley Bus. J. (Aug. 31, 2016, updated Sept. 1, 2016, 7:23 AM), https://www.bizjournals.com/sanjose/news/2016/08/31/silicon-valley-in-vr-inside-fanatics-san-mateo.html; *compare Contact Us*, *supra* (noting that "Fanatics Commerce Headquarters" is in Jacksonville, Florida) *with* Karen Brune Mathis, *Fanatics Setting Up Satellite Office*, Jacksonville Daily Rec. (Dec. 19, 2018), https://www.jaxdailyrecord.com/article/fanatics-setting-up-satellite-office (stating that Fanatics's "West Coast headquarters is in San Mateo, California").

9

CLASS ACTION COMPLAINT
CASE NO.

the CEO and CFO, work at Fanatics' 50,000 square foot "West Coast Headquarters" in San Mateo.[12]

51.     Fanatics manufactures, distributes, and retails NFL Licensed Products. Fanatics describes itself as a "global leader in licensed sports merchandise" that "offers the largest collection of timeless and timely merchandise whether shopping online, on your phone, in flagship stores, in stadiums, or on-site at the world's biggest sporting events."[13] Fanatics owns and operates online retail sites including fanatics.com and fansedge.com, as well as retail sites for which it licenses the domain name from other Defendants, such as NFLShop.com and the fan shops of various Teams. Over 80% of Fanatics' revenue come from direct-to-consumer e-commerce sales.[14]

52.     In addition to its role as a retailer, Fanatics also manufactures NFL Licensed Products as a licensee of the NFL Defendants.

## III.     AGENTS AND CO-CONSPIRATORS

53.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

54.     The Defendants' agents operated under the explicit and apparent authority of their principals.

---

[12] *See* Ard, *supra*; Basch, *supra*; *Doug Mack*, LinkedIn, https://www.linkedin.com/in/doug-mack-a65a574/ (last visited Dec. 18, 2021) (stating that Doug Mack, the CEO of Fanatics, Inc., is located in "San Mateo, California"); *Fanatics Commerce: Leadership Team*, Fanatics, https://www.fanaticsinc.com/commerce-leadership (last visited Dec. 18, 2021); *Michener Chandlee*, LinkedIn, https://www.linkedin.com/in/michener-chandlee-13237a/ (last visited Dec. 18, 2021) (stating that Mich Chandlee, the CFO of Fanatics, Inc., is located in "San Mateo, California").

[13] *Why Shop With Us?*, Fanatics, https://www.fanatics.com/why-shop-with-us/ch-2389 (last visited Aug. 17, 2021).

[14] Sebastian Herrera, *Web Retailer Fanatics Raises $350 Million Amid Rebound in IPO Market*, Wall Street J. (Aug. 13, 2020), https://www.wsj.com/articles/web-retailer-fanatics-raises-350-million-amid-rebound-in-ipo-market-11597352761.

CLASS ACTION COMPLAINT
CASE NO.

55.     Each Defendant, and its subsidiaries, affiliates and agents operated as a single unified entity.

56.     Various other individuals and entities not currently named as defendants herein participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. For example, certain licensees have joined the conspiracy and enforced the anticompetitive policies against retailers that would otherwise compete with Fanatics, the NFL, and the Teams. These licensees have threatened to withhold inventory and have terminated or restricted longstanding commercial relationships in service of Defendants' anticompetitive scheme. Those co-conspirators and their conduct are described below.

57.     Each Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

**IV.     JURISDICTION AND VENUE**

58.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the Complaint raises a federal question, and § 1337, as the claims are asserted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) and Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2).

59.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from any Defendant.

60.     This Court has personal jurisdiction over each Defendant pursuant to 15 U.S.C. § 22, 28 U.S.C. § 1391, and *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004).

61.     Venue lies in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 because each Defendant transacts business, committed an unlawful act, and/or is located in this

CLASS ACTION COMPLAINT
CASE NO.

district; and (ii) a substantial portion of the conduct detailed herein, and which affects interstate commerce and trade, has occurred in this district.

62.     Each Defendant, either directly or through the ownership and/or control of its U.S. subsidiaries, (a) transacted business in the United States, including in the jurisdictions in which the Court sits; (b) directly or indirectly sold or marketed substantial quantities of NFL Licensed Products throughout the United States, including the jurisdictions in which the Court sits; (c) had substantial aggregate contacts with the United States as a whole, including the state wherein the Court sits; (d) carried out conspiratorial schemes in the United States, including in the state in which the Court sits; and (e) engaged in an illegal conspiracy to suppress competition that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons or entities residing in, located in, or doing business in the state in which the Court sits, and throughout the United States, including Plaintiffs and the proposed Class.

63.     Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, cable, wires, wireless spectrum, and the U.S. mail, to effectuate their unlawful scheme.

64.     Defendants have extensive contacts with the State of California. Four Teams were based in California when the conspiracy was first implemented, the most of any state.[15] During the relevant time frame, Fanatics maintained a West Coast headquarters in San Mateo, California. Fanatics' CEO and CFO are both based in San Mateo, California.[16] All Defendants sell and ship millions of dollars' worth of NFL Licensed Products to customers in California. On information and belief, more members of the proposed class reside in California than any other state.

---

[15] The Las Vegas Raiders moved to Las Vegas from Oakland, California in 2020.
[16] *See* Basch, *supra*; *Doug Mack*, *supra*; *Michener Chandlee*, *supra*.

12

CLASS ACTION COMPLAINT
CASE NO.

65.     Defendants also maintain close ties to the Northern District of California. Two Teams (the San Francisco 49ers and the (formerly) Oakland Raiders) called the Bay Area home during the relevant period. Fanatics maintains its West Coast Headquarters in this District and Fanatics' CEO and CFO maintain their primary offices in this District.

66.     Defendants' unlawful activities substantially affect commerce throughout the United States, causing injury to Plaintiffs and the members of the Class. Defendants, directly and through their agents, engaged in anticompetitive activities affecting all states, as Defendants coordinated activities related to marketing, design and manufacture, pricing, sales, and shipments of NFL Licensed Products to customers throughout the country.

67.     Defendants' conspiracy and anticompetitive conduct described in this Complaint caused, and continues to cause, Plaintiffs and the members of the Class to pay unlawfully inflated prices for NFL Licensed Products they purchased from Defendants.

## V.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

68.     Plaintiffs bring this action seeking damages and equitable relief under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and do so on behalf of themselves and the following Class:

> All persons or entities in the United States (including its territories and the District of Columbia) who purchased NFL Licensed Products online from Fanatics, any NFL Defendant or Team, any current or former subsidiary or affiliate of these Defendants at any time from January 1, 2016, through such time as the effects of the unlawful conduct ceased (the "Relevant Time Period").

69.     Excluded from the Class are:

(a)     persons or entities who purchased NFL Licensed Products for resale;

(b)     Defendants and their officers, directors, management, employees, subsidiaries, and affiliates; and

CLASS ACTION COMPLAINT
CASE NO.

1      (c)     any judicial officer presiding over this action, the members of that

2    officer's immediate family and judicial staff, and any juror assigned to this action.

3      70.     Plaintiffs reserve the right to revise the class definition based on information

4    learned through discovery.

5      **B.     Class Certification Requirements Under Rule 23**

6      71.     The Rule 23 requirements are satisfied as to the Class.

7      72.     **Numerosity: Rule 23(a)(1).** The Class is so numerous and geographically

8    dispersed that individual joinder of all members is impracticable. Plaintiffs are informed and

9    believe that the Class contains hundreds of thousands (and potentially millions) of members. The

10   precise number may be ascertained from Defendants' records. Members of the Class may be

11   notified of the pendency of this action by recognized methods, which may include U.S. mail, e-

12   mail, internet postings, social media, and publication.

13     73.     **Commonality: Rule 23(a)(2).** This action involves significant common questions

14   of law and fact, including:

15          (a)     Whether Defendants engaged in the conduct alleged in this Complaint;

16          (b)     The identity of the participants and co-conspirators in the scheme alleged

17   in this Complaint;

18          (c)     Whether Fanatics and the NFL Defendants act as online retailers of NFL

19   Licensed Products;

20          (d)     Whether Defendants agreed to exclude retailers from TPOMs by forcing

21   licensees to refuse to sell NFL Licensed Products to retailers selling those products on TPOMs

22   who had not been approved by the NFL Defendants ("Boycotted Retailers");

23          (e)     Whether the NFL Defendants agreed to threaten to deny licenses to use the

24   Teams' intellectual property to licensees that would not prohibit the retail sale of their products

25   on TPOMs by Boycotted Retailers;

26

27

28
                                                    14
     CLASS ACTION COMPLAINT
     CASE NO.

(f)      Whether the NFL Defendants denied or revoked licenses of licensees who did not ensure that their NFL Licensed Products were not sold on TPOMs by Boycotted Retailers;

(g)      Whether any Boycotted Retailers applied to NFLP for permission to sell NFL Licensed Products on the Amazon Marketplace;

(h)      Whether NFLP denied any Boycotted Retailers' applications for permission to sell NFL Licensed Products on the Amazon Marketplace;

(i)      Whether Fanatics conditioned its purchases of NFL Licensed Products from manufacturers on their refusal to sell their products to Boycotted Retailers;

(j)      Whether Fanatics' agreement with manufacturers caused them to refuse to sell their products to Boycotted Retailers;

(k)      Whether Boycotted Retailers were excluded from TPOMs;

(l)      Whether members of the conspiracy continued to retail NFL Licensed Products on TPOMs;

(m)      Whether the exclusion of Boycotted Retailers from TPOMs constitutes a horizontal group boycott;

(n)      Whether Defendants' alleged group boycott is *per se* unlawful;

(o)      In the alternative, whether Defendants have market or monopoly power in the relevant product markets; whether there are any procompetitive justifications for Defendants' conduct stemming from the restraints at issue; and whether those procompetitive justifications are outweighed by the anticompetitive effects of Defendants' collusion;

(p)      Whether the NFL licensed the NFLShop.com domain name to competitor retailer Fanatics to operate the NFL's online retail store;

(q)      Whether individual Teams licensed their own fan shops' domain names to competitor retailer Fanatics to operate the Teams' online retail stores;

15

CLASS ACTION COMPLAINT
CASE NO.

1       (r)     Whether Defendants prohibited competing retailers from using NFL-related keywords to advertise those retailers' products online;

3       (s)     Whether Defendants' collusion resulted in harm to competition by driving competitor retailers out of the online market for NFL Licensed Products;

5       (t)     Whether Defendants' collusion harmed competition by reducing the supply and variety of NFL Licensed Products;

7       (u)     Whether Defendants' collusion harmed competition by enabling Defendants to charge supracompetitive prices for NFL Licensed Products;

9       (v)     Whether Plaintiffs and members of the Class were harmed by paying supracompetitive prices paid for NFL Licensed Products;

11       (w)     Whether Plaintiffs and members of the Class had reason to know of or suspect Defendants' conduct or means to discover the collusion;

13       (x)     Whether Defendants fraudulently concealed their conduct from Plaintiffs and members of the Class;

15       (y)     Whether Plaintiffs and members of the Class are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

17       (z)     Whether Plaintiffs and members of the Class are entitled to damages and other monetary relief and, if so, in what amount.

74.    **Typicality: Rule 23(a)(3)(i).** Plaintiffs' claims are typical of those of the members of the Class whom he seeks to represent. Plaintiffs' claims are typical because Plaintiffs and each member of the Class directly purchased NFL Licensed Products from Defendants online and thus were similarly injured as a direct and proximate result of Defendants' wrongful practices as described in this complaint. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other members of the Class and are based upon the same legal theories as those claims.

CLASS ACTION COMPLAINT
CASE NO.

75.     **Adequacy: Rule 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have retained competent counsel experienced in complex class action litigation, including antitrust class actions. Plaintiffs intends to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with those of the other members of the Class. Therefore, the interests of the members of the Class will be fairly and adequately protected.

76.     **Declaratory and Injunctive Relief: Rule 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

77.     **Predominance: Rule 23(b)(3).** The common questions of law and fact predominate over any questions individual to members of the Class.

78.     **Superiority: Rule 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties will be encountered in the management of this class action. The burden and expense that would be required to individually litigate the claims of each member of the Class against Defendants make it impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

79.     Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments. Individualized litigation further increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

17

CLASS ACTION COMPLAINT
CASE NO.

## VI.   INDUSTRY BACKGROUND

### A.   The NFL and Fanatics

80.   The allegations that follow in this Complaint are not based on speculation. They are taken from news articles, Defendants' public statements, and Defendants' correspondence with industry participants. Plaintiffs' counsel's investigation into the factual allegations contained herein is continuing. Many of the relevant facts are known only to Defendants or are exclusively within Defendants' custody and control. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein and that such evidence will be available after a reasonable opportunity for discovery.

81.   The NFL is the most popular sports league in the United States in terms of television ratings and merchandise sales; it brings in billions of dollars in television revenue each year and many millions more in ticket sales and concessions. The NFL also collects hundreds of millions of dollars in licensing fees from companies who make and sell t-shirts, jerseys, shot glasses, and other NFL Licensed Products stamped with an iconic team logo such as the Dallas Cowboys' blue star or the Las Vegas Raiders' helmeted pirate.

82.   In order to manufacture NFL Licensed Products, a manufacturer must obtain a license to use the logos, trademarks, and emblems from each Team whose intellectual property the manufacturer wishes to use.

83.   Each Team owns its own intellectual property and is thus free to license it according to that Team's own judgment. In a competitive marketplace, the Teams would compete with one another to license their trademarks to compete with other Teams.

84.   But instead of competing independently, the Teams formed a cartel to jointly organize the licensing of their marks as a single group through Defendant National Football League Properties, Inc. ("NFLP"). Unlike real competitors in an open and competitive marketplace, the Teams' collusive marketing agreements disincentivize competition among themselves.

18

CLASS ACTION COMPLAINT
CASE NO.

85.     NFLP, on behalf of all Teams, grants a manufacturer a license to produce NFL Licensed Products bearing the Teams' intellectual property. Licensees pay millions of dollars to acquire licenses. Fanatics, for example, in its role as a manufacturer-licensee, spent more than $500 million on professional sports licensing rights in 2020 alone.[17]

86.     The NFL Licensed Products manufactured under these licenses are then sold to consumers (typically but not exclusively via separate distributors and retailers) in both online and brick-and-mortar stores.

87.     Firms that occupy upstream positions in the supply chain of NFL Licensed Products as manufacturers or trademark owners may also be retailers selling directly to consumers. Although the Teams collectively license their marks to licensees who make NFL Licensed Products that are then distributed and retailed by others, those Teams also sell licensed products directly to consumers in their online and brick-and-mortar stores. The same is true of licensees, some of whom manufacture products that they sell to both distributers and directly to customers.

88.     The last 20 years have seen a dramatic shift from traditional "brick-and-mortar" businesses to "e-commerce," which is the buying and selling of goods or services using the internet.

89.     Although the Teams sell NFL Licensed Products online through their individual sites, by far the biggest player in the online retail market for licensed sports merchandise is Fanatics.

90.     When Rubin purchased the Fanatics in 2011, it was worth $250 million. As one of the first major online retailers of licensed sports merchandise, Fanatics grew in tandem with the increasing popularity of online shopping.

---

[17] NBC Sports Phila., *Sixers Partner Michael Rubin: Barkann's Big Guest*, YouTube (Dec. 18, 2019), https://www.youtube.com/watch?v=IQRzlcywjO4.

19

CLASS ACTION COMPLAINT
CASE NO.

91.     In May 2017, the NFL invested almost $100 million to acquire an equity stake in Fanatics. As Fanatics' value grows, so does the value of the NFL's equity share. Thus, it is in the NFL's financial interest to assist Fanatics in its campaign to usurp as much of the online retail space as possible.

92.     These efforts have paid off. In 2017, when the NFL acquired its equity stake, Fanatics was valued at $4.5 billion.[18] Today, Fanatics is valued at $18 billion,[19] and is preparing to go public.[20]

**B.      Third-Party Online Marketplaces ("TPOMs")**

93.     A TPOM is a web-based platform which offers a range of capabilities that connects sellers with buyers, for example wholesale companies and end customers. A TPOM offers users an interface to the supplier's product catalogues and may additionally support payment, logistics, or ordering.[21] Examples of TPOMs include eBay, Amazon, Walmart, Alibaba, and Etsy.

94.     By contrast, an eCommerce platform is a software application that lets online brands manage their website, operations, marketing and sales in one location. Using an eCommerce platform is the online equivalent of a business having its own brick and mortar storefront, with its branding and messaging. A TPOM, on the other hand, is more like renting space in a department store to showcase a business' products or services—the business did not

---

[18] Randall Williams, *With an $18 billion valuation and big moves into trading cards and sports betting, let's take stock of the apparel and memorabilia giant's story so far*, Boardroom (Feb. 4, 2022), https://boardroom.tv/fanatics-company-history/.
[19] *Id.*
[20] Jabari Young, *$18 billion online retailer Fanatics shocked the sports world with its MLB trading card deal — Here's what's next ahead of its expected IPO*, CNBC (Sep. 1, 2021), https://www.cnbc.com/2021/09/01/18-billion-fanatics-prepares-for-ipo-heres-whats-next-for-the-company.html.
[21] *Third-Party Marketplaces*, KB Manage, https://www.kbmanage.com/concept/third-party-marketplaces#:~:text=Third%2DParty%20Marketplaces%20Definition,customers%20(Ince%2C%202004) (last accessed Feb. 4, 2022).

CLASS ACTION COMPLAINT
CASE NO.

have to do all the work of putting the shelves in place, nor does it get to stick its branding all over the storefront, but it still gets to stock out a corner of the store.[22]

95.   TPOMs are growing in popularity. In Q4 2020, TPOMs grew by 81% YOY, more than double the rate of overall eCommerce growth.[23]



96.   TPOM's popularity is attributable to growth and speed—for companies with an established online presence, creating a third-party marketplace offers a quick, relatively easy way to boost top-line sales and bottom-line profits. A bonus is the opportunity to gather data from potential new customers as well as explore possible category expansions with less downside risk.[24]

97.   TPOMs offer established retailers several benefits, including (a) a relatively low-risk way to expand the breadth and depth of their offerings; (b) a critical tool to capture consumers' attention for longer as first-party data becomes table stakes; (c) the potential to build

---

[22] *What is an E-Commerce Platform vs. a Third-Party Marketplace?*, 2Stallions, https://2stallions.com/blog/e-commerce-platform-vs-third-party-marketplace/ (last accessed Feb. 4, 2022).
[23] *Are Third-Party Marketplaces the Growth Driver Legacy Retail is Looking for?*, Retail Touch Points, https://www.retailtouchpoints.com/topics/digital-commerce/are-third-party-marketplaces-the-growth-driver-legacy-retail-is-looking-for#:~:text=Marketplaces%20grew%20by%2081%25%20YoY,from%2060%20global%20retailer%20marketplaces (last accessed Feb. 4, 2022).
[24] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

out the flywheel, à la Amazon, and bring in additional revenue by offering advertising and fulfillment services to sellers; and (d) an opportunity to transform their eCommerce business in a way that is easily scalable and reactive to consumer demand.[25]

98.    TPOMs also allow smaller retailers easier access to the market by lowering barriers to entry for sellers. For example, a business can sign up to be an Amazon seller a lot faster than it can build its own website. Additionally, small retailers benefit from the name recognition and online "foot traffic" of established TPOMs. It is much harder for a small retailer to attract customers to its own website than it is to benefit from the millions of people that search for products on Amazon every day.

99.    Finally, TPOMs benefit consumers by increasing price, quality, and service competition. On TPOMs, third-party sellers compete to sell the same or similar products, and one product can have multiple listings. Repricing frequency is much higher on TPOMs compared to eCommerce websites. Sellers often reprice in near real-time. This fast-paced, automated repricing allows sellers to compete for the "Buy Box," which most TPOMs have.[26] Most consumers buy items through the Buy Box section of a TPOM (on Amazon, the white box on the right-hand side of the page) on the desired product page. When a consumer proceeds to buy the product through this section, the seller which is highest ranked by the TPOM at that time will show up there.[27] Buy Box winners tend to get 80 percent of total sales for a product. Amazon and Walmart have algorithms to determine which listing wins the Buy Box—while price is a very important factor, other things like seller feedback and ratings are also considered.[28]

---

[25] *Id.*

[26] Matt Ellsworth, eCommerce Pricing: How to Price for Marketplaces vs. Your Website, Wiser (Apr. 13, 2021), https://blog.wiser.com/ecommerce-pricing-how-to-price-for-marketplaces-vs-your-website/.

[27] Amazon Buy Box, Feedvisor, https://feedvisor.com/university/amazon-buy-box/ (last accessed Feb. 4, 2022), https://feedvisor.com/university/amazon-buy-box/.

[28] Ellsworth, *supra*.

CLASS ACTION COMPLAINT
CASE NO.

1

VII.    **FACTUAL ALLEGATIONS**

2

100.    Aware of the importance of TPOMs to healthy competition in this market,

3  Defendants have conspired to drive competing retailers off TPOMs, thereby significantly

4  impairing those competitors' ability to participate in the online retail market for NFL Licensed

5  Products. Defendants' conspiracy consists of at least four related components:

6

101.    *First*, Defendants colluded to boycott competing retailers who sold NFL Licensed

7  Products through third-party online marketplaces like the Amazon Marketplace. This boycott

8  eliminated Defendants' competitors who would have charged lower prices for NFL Licensed

9  Products sold online. In so doing, the boycott removed the downward pressure on prices and

10 margins that, absent the conspiracy, would have otherwise flowed directly from enhanced

11 competition.

12

102.    *Second*, having greatly reduced the number of retailers in online marketplaces,

13 Defendants conspired to fill the void by entering exclusive dealing arrangements that denied

14 their competitors access to manufacturers and suppliers.

15

103.    *Third*, having solidified their dominant position in the online retail market for

16 NFL Licensed Products, Defendants, rather than compete with one another, entered into

17 anticompetitive licensing agreements to further reduce competition.

18

104.    *Fourth*, Defendants have prohibited competing retailers from using NFL-related

19 keywords to advertise or in some cases even describe their products online, thereby rendering

20 competitors' offerings effectively invisible to online consumers.

21

     A.    **Defendants Agreed to Boycott Retailers Selling NFL Licensed Products**

22

            **Through TPOMs.**

23

105.    Defendants conspired to eliminate competing retailers from the online

24 marketplace by forbidding manufacturers from allowing their NFL Licensed Products to be sold

25 by competing third-party retailers on TPOMs.

26

27

28

CLASS ACTION COMPLAINT
CASE NO.

106.     TPOMs dominate the online retail market. As discussed above, TPOMs function like a farmer's market or bazaar where a single location hosts multiple independent sellers, who often offer the same or very similar products and compete on the basis of price or quality. In exchange for providing a platform for sales, a TPOM takes a commission from third-party retailers' sales (and may charge other fees as well).

107.     Amazon.com is the largest player in the U.S. e-commerce market, with a 49% market share in 2018.[29] In the fourth quarter of 2014, third-party sellers on the Amazon Marketplace accounted for 43% of units sold and 52% in the same quarter in 2018.[30] These figures show that roughly a quarter of all U.S. e-commerce sales occur via third-party retail on the Amazon Marketplace. Given that a large number of additional online sales take place on other popular TPOMs such as eBay and Walmart.com, the pivotal role of TPOMs within U.S. e-commerce is undeniable.

108.     Consistent with the importance of TPOMs to e-commerce generally, prior to the conspiracy, the Amazon Marketplace (along with other TPOMs) had become a crucial and popular avenue through which consumers and retailers could participate in the online retail market for NFL Licensed Products.

109.     Most TPOMs are designed so that they display all the sellers of the same or very similar products on the same webpage, typically in response to consumers' search terms. The ease with which consumers can compare competing retailers' offerings means that there is intense competition for sales. Thus, winning sales on a TPOM means successfully competing on price because each potential customer can easily see each sellers' prices and so will almost always choose the lowest or near-lowest price. And because the number of sellers for a particular

---

[29] Ingrid Lunden, *Amazon's Share of the US E-commerce Market Is Now 49%, or 5% of All Retail Spend*, Tech Crunch (July 13, 2018), https://techcrunch.com/2018/07/13/amazons-share-of-the-us-e-commerce-market-is-now-49-or-5-of-all-retail-spend/.

[30] Stephanie Chevalier, *Share of Paid Units Sold by Third-Party Sellers on Amazon Platform as of Second Quarter 2021*, Statista (Aug. 11, 2021), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

24

CLASS ACTION COMPLAINT
CASE NO.

product is usually high, tacit price coordination among retailers is simply not possible. At the end of the day, according to Rubin, if everyone else is selling what you're selling on a TPOM, "it is going to get commoditized by Amazon and Alibaba."[31]

110.    Prior to the conspiracy, Defendants had to compete with retailers selling NFL Licensed Products thought TPOMs, both through their independent e-commerce platforms that retail NFL Licensed Products (e.g., Fanatics.com; NFLShop.com; Shop.chargers.com), but also on TPOMs where they sold the same products.

111.    This competition posed a problem for Defendants—the presence of smaller price-cutting rivals selling the same or similar NFL Licensed Products on TPOMs prevents Defendants from setting and maintaining higher prices (and the greater profit margins that result). This preclusion constrains not only prices on TPOMs but also the prices Defendants can set on their independent e-commerce sites.

112.    Rather than figuring out how to meet this challenge through lawful competition, Defendants employed a group boycott to drive competing retailers from the online market for NFL Licensed Products.

113.    Faced with the challenge of increased competition and recognizing the benefits of collusion, Defendants conspired to allocate the online retail market for NFL Licensed Products. Defendants unlawfully leveraged their market power over licensees to force those licensees to boycott smaller retailers who sold NFL Licensed Products through TPOMs.

114.    Defendants employed a "carrot-and-stick" approach to enlist licensees' cooperation. Defendants first issued a threat: if a licensee did not comply, it would lose both its license to manufacture NFL Licensed Products and Fanatics' business. Then, as the carrot, Fanatics promised that it would increase its purchases from those licensees who played ball in order to make up for the now-forbidden sales to smaller retailers.

---

[31] *Kynetic CEO: Here's How a $12 Billion Company Competes Against Amazon*, CNBC: Squawk Box (Nov. 27, 2017), https://www.cnbc.com/video/2017/11/27/kynetic-ceo-heres-how-a-2-billion-company-competes-against-amazon.html.

CLASS ACTION COMPLAINT
CASE NO.

115.    Defendants' scheme to corner the online marketplace begins with the Teams'

policies regarding online distribution and marketing of the Teams' licensed products. These

policies, issued through NFLP, forbade licensees from selling NFL Licensed Products to retailers

operating on TPOMs (the "No TPOM Sellers Policy").

116.    In 2016, the NFL informed its licensees that they would no longer be allowed to

sell their NFL Licensed Products to retailers selling those products using TPOMs (or to

distributors servicing those retailers).[32]

117.    Each licensee understood that it "ha[d] to comply with this policy in full or risk

losing [its] ability to continue to make NFL licensed goods."[33] That is, the licensees believed that

if they did not comply with the wishes of the NFL Defendants, they would lose access to the

Teams' intellectual property and so be unable to continue making and selling NFL Licensed

Products. As a result, licensees began to refuse to sell to retailers who would not or could not

stop selling NFL Licensed Products on TPOMs.[34]

118.    In the next iteration of the No TPOM Sellers Policy, the NFL issued a written

"Online Distribution Policy," which provided that "Licensees shall ensure that . . . any retailer . .

. shall not offer such products for sale via the website portal of a third party that is not otherwise

authorized by NFLP to sell Gameday Product/Practice wear Apparel."[35]

119.    The Online Distribution Policy purportedly applied to all sales of NFL Licensed

Products, and it was the express obligation of all licensees to ensure downstream retailers'

compliance. Once retailers were approved to sell NFL Licensed Products, NFL licensees were

required to ensure that such retailers "maintain[ed] control over, and responsibility for, their e-

commerce transactional environment." Further, retailers were not allowed to sell NFL Licensed

---

[32] joevcap, *Selling NFL Products*, eBay: Community (Mar. 19, 2016, 10:23 AM),
https://community.ebay.com/t5/Member-To-Member-Support/selling-NFL-products/qaq-
p/25336602.
[33] *Id.*
[34] *Id.*
[35] *2017 and 2018 NFL Seasons – Online Distribution Policy*, https://www.smartblonde.net
/content/MLB_and_NFL_Policy.pdf (last visited Sept. 5, 2021).

CLASS ACTION COMPLAINT
CASE NO.

Products on any TPOM without the NFL's prior written consent. However, the policy did not prohibit licensees from selling their products directly to e-commerce websites such as Amazon or Fanatics.

120.　　After the NFL's 2017 investment of $95 million in Fanatics, enforcement of the Online Distribution Policy greatly expanded. Licensees began to pressure retailers to remove NFL Licensed Products from TPOMs under penalty of being cut off entirely.

121.　　In a letter dated February 26, 2018, Casey's Distributing (a distributor and retailer of NFL Licensed Products) ("Casey's"), received a demand from a high-ranking official at Franklin Sports (a licensee and supplier to Casey's) that Casey's remove NFL Licensed Products produced by Franklin Sports from TPOMs.

122.　　At least one licensee who protested that enforcing the new policy would mean lost sales was promised that Fanatics would make up for those sales by increasing its own purchases from that manufacturer. Further investigation through discovery will confirm that Fanatics also provided hesitant licensees with financial projections showing the additional purchases Fanatics would make from licensees who cut off existing customers.

123.　　Defendants furthered their scheme by requiring licensees to ask their distributor customers to identify the retailers to whom those distributors sold NFL Licensed Products so that Defendants could more easily exclude those retailers from TPOMs. For instance, Casey's received an email on August 5, 2020, from licensee Little Earth Productions asking for the identity of retailers to whom Casey's sold a large number of NFL Licensed Products because Little Earth "need[ed] to advise the NFL of where our NFL items are retailing." The purpose of this inquiry was to enable the NFL Defendants to identify additional retailers operating on TPOMs to boycott.

124.　　Many distributors and online retailers would not or could not (because of the importance of TPOM sales to their businesses) comply with these requirements. Licensees

CLASS ACTION COMPLAINT
CASE NO.

responded by discontinuing longstanding business relationships with these distributors and retailers.

125.    Fanatics is the key driver and enforcer of the conspiracy, using high-pressure strong-arm tactics to encourage licensees to help eliminate Fanatics' competitors from TPOMs. Fanatics created reports that it sent to licensees showing the names of sellers and products offered for sale on TPOMs and threatened the licensees with consequences if the reports did not show "progress" in lowering the number of competing retailers and products offerings.

126.    As time passed, enforcement of the boycott intensified. On August 1, 2020, a representative from FOCO, a licensed manufacturer of NFL Licensed Products instructed Amzn Sports, a retailer selling on the Amazon Marketplace, to remove listings for FOCO's NFL-branded neck gaiters. Around the same time, FOCO also contacted Lollipop Sports and informed Lollipop that the NFL had identified Lollipop as selling FOCO's NFL-branded neck gaiters on the Amazon Marketplace. FOCO instructed Lollipop to remove those listings.

127.    In October 2020, WinCraft, another licensee, required Casey's to remove 2,000 WinCraft items from Casey's Amazon Marketplace store. WinCraft told Casey's that it was "acting on behalf of Fanatics." WinCraft made this demand while it was secretly negotiating to sell its business to Fanatics in a deal that would be consummated mere weeks later.

128.    During a call on January 25, 2021, a high-level WinCraft representative demanded that Casey's remove 500 more items. WinCraft was now owned by Fanatics and explained that this request was directed by Fanatics in order to eliminate Fanatics' horizontal competitors in the online retail market for NFL Licensed Products. According to WinCraft, Fanatics' CEO was "really pissed off" that WinCraft had not been aggressively enforcing the No-TPOM Sellers Policy.

129.    The high-level representative also told Casey's that (i) Fanatics was forcing WinCraft to enforce the No TPOM Sellers Policy, (ii) he knew TPOMs are the industry's future, (iii) he knew that enforcing the policy would drive Casey's out of business, but that (iv) Casey's

28

CLASS ACTION COMPLAINT
CASE NO.

must still reduce its listings on Amazon. According to this representative, Fanatics wanted to dominate the industry at all costs by putting pressure on WinCraft to eliminate Fanatics' horizontal competitors. He also sent Casey's a compliance tracker showing how other companies had already reduced listings of WinCraft products on TPOMs.

130.     This call marked a significant change in Casey's relationship with WinCraft. Casey's had received WinCraft's "Distributor of the Year" award for the previous two years.

131.     On February 10, 2021, WinCraft emailed Casey's that Casey's must cease any sales of WinCraft's NFL Licensed Products to any of Casey's customers that were selling those products on TPOMs. WinCraft backed up this demand with a threat that if Casey's did not comply, WinCraft would cut off all sales of its products to Casey's.

132.     Finally, on March 16, 2021, WinCraft demanded that Casey's remove all NFL Licensed Products (along with those from other leagues) from its Amazon Marketplace store. WinCraft did so even though it had previously acknowledged that enforcement of the policy would benefit only Fanatics while putting numerous small retailers out of business.

133.     The foreseeable result of the boycott was to reduce the number of online retailers selling NFL Licensed Products to consumers on TPOMs. Defendants took advantage of the vacuum their boycott had created to become the only retailers of NFL Licensed Products on the most popular TPOMs to the detriment of consumers who are now deprived of choice among retailers who compete on the basis of price.

134.     For example, in 2019, Fanatics became the exclusive provider of NFL Licensed Products on Walmart.com.[36] Walmart.com is a prohibited TPOM under NFLP's policies, and yet Fanatics (and the Teams) declined to apply the No TPOM Sellers Policy to Fanatics itself.

135.     Under the terms of the No TPOM Sellers Policy, only sales to retailers operating on TPOMs were forbidden. Nevertheless, licensees cooperating with Defendants informed

---

[36] Lauren Thomas, *Another jab at Amazon*, CNBC (Jan. 29, 2019), https://www.cnbc.com/2019/01/29/walmart-is-bringing-fanatics-to-its-website-to-sell-sports-apparel.html

CLASS ACTION COMPLAINT
CASE NO.

distributors they could no longer sell to Amazon itself, even though Amazon retailing those products (rather than third-party sellers on the Amazon Marketplace) could not violate the No TPOM Sellers Policy.

136.    In accordance with the policy, cooperating licensees forbade distributors and retailers from allowing the licensees' NFL Licensed Products to be sold on TPOMs. However, these licensees did not limit this prohibition on retail sales to goods that distributors and retailers would purchase from the licensees in the future. Instead, the licensees forbade the distributors and retailers from using TPOMs to sell goods that had already been purchased from the licensees before the policies were announced. No privity binds the distributors and retailers to the No TPOM Sellers Policy. Nevertheless, and without basis in any agreement between licensees and distributors or retailers, the licensees (at the request of Fanatics and/or the NFL) prevented them from selling NFL Licensed Products on TPOMs even though the distributors and retailers had already acquired those goods without any restrictions on where they could be retailed.

137.    Defendants' success in eliminating competitor retailers from the Amazon Marketplace is confirmed by news articles reporting that, as late as March 2021, "the assortment of official products on Amazon's marketplace ha[d] been fairly limited."[37] Another report described this as plugging a "gap" in the availability of NFL Licensed Products on Amazon.[38]

138.    Defendants exploited this situation (which was itself the result of the anticompetitive No TPOM Sellers Policy) by striking a deal with Amazon to make NFL Licensed Products available through the Fanatics-operated NFL Shop on the Amazon Marketplace (the "Merchandise Agreement"). "The partnership is a convergence of three superlative companies—the world's richest sports league (NFL), the world's largest retailer (Amazon), and the world's largest seller of licensed fan gear (Fanatics)."[39]

---

[37] Novy-Williams, *supra*.
[38] S. Shah, *Amazon Begins Selling NFL Merch After Securing Thursday Night Football Deal*, Endgadget (Mar. 25, 2021), https://www.engadget.com/amazon-official-nfl-merch-thursday-night-football-124004019.html.
[39] Novy-Williams, *supra*.

30

CLASS ACTION COMPLAINT
CASE NO.

1    139.    Because the Merchandise Agreement opened Amazon's platform up to Fanatics—

2  Amazon's erstwhile competitor in the online retail market for NFL Licensed Products—it has

3  been aptly described as "a move that could transform the multibillion-dollar market for fan

4  gear."[40] As a result of this agreement, Fanatics now operates both the NFL's online store and the

5  NFL Shop "storefront" on the Amazon Marketplace to the exclusion of other retailers that

6  formerly competed with Fanatics.[41]

7    140.    The Merchandise Agreement followed the NFL's blockbuster broadcast streaming

8  rights deal with Amazon. On or about March 18, 2021, the NFL and Amazon announced that the

9  NFL had granted Amazon "all-digital" broadcasting rights for "Thursday Night Football."[42]

10    141.    Commenting on both the streaming rights deal and the NFL's decision to sell

11  NFL Licensed Products on Amazon, *Sportico* observed that "[t]hough this fan gear partnership is

12  separate from that media negotiation, they are strategically connected."[43] *Engadget* similarly

13  noted that "[i]t's hard to ignore the timing of the tie-up, which arrives on the heels of Amazon's

14  exclusive grab of *Thursday Night Football* rights for its Prime Video service."[44]

15  142.    According to a Fanatics spokesperson:

16         As part of the National Football League and Amazon's collaboration to expand the
         assortment of officially licensed NFL products, Fanatics will be opening an NFL
17         storefront on Amazon in the near future and, along with other authorized sellers, is

18

19

20  [40] *Id.*

21  [41] Brendan Menapace, *NFL to Start Selling Licensed Merchandise Via Amazon Storefront
    Operating by Fanatics*, Promo Marketing Mag. (Mar. 25, 2021),

22  https://magazine.promomarketing.com/article/amazon-will-start-selling-licensed-nfl-
    merchandise-via-fanatics/; *see also Fanatics, NFL to Launch Amazon Storefront*, SGB Media

23  (Mar. 29, 2021), https://sgbonline.com/fanatics-nfl-launching-amazon-storefront/.

24  [42] *See NFL Completes Long-Term Media Distribution Agreements Providing Fans With Greater
    Access to NFL Games Than Ever Before*, NFL Comm. (Mar. 18, 2021),

25  https://nflcommunications.com/Pages/NFL-COMPLETES-LONG-TERM-MEDIA-
    DISTRIBUTION-AGREEMENTS-PROVIDING-FANS-GREATER-ACCESS-TO-NFL-

26  GAMES-THAN-EVER-BEFORE.aspx.

27  [43] Novy-Williams*, supra.*

    [44] Shah, *supra.*

                                    31

28  CLASS ACTION COMPLAINT
    CASE NO.

now enhancing the fan shopping experience through an increased selection of officially licensed NFL products.[45]

143. The claim to be motivated by a desire for an improved customer experience is pretextual—Fanatics has consistently had more negative customer reviews than many of the smaller retailers who have been forced off the Amazon Marketplace.

144. As part of the Merchandise Agreement, Amazon agreed to prohibit sales of NFL Licensed Products on the Amazon Marketplace unless the NFLP had approved the retailer. Accordingly, Amazon notified Casey's on March 24, 2021, that, under a "new agreement with the NFL," Casey's must become an NFL-authorized seller to continue selling NFL Licensed Products.

145. According to NFLP's Approved Marketplace Retailer Application ("AMRA"), there would be a "limited number of approved, high-quality retailers that will sell those NFL [L]icensed [P]roducts under an Amazon URL through the Amazon Marketplace." In the AMRA, NFLP "reserve[d] the right to approve or disapprove [a retailer's] Application, in its sole and absolute discretion." Through the NFLP, the Teams thus claim an exclusive and nonreviewable right to exclude potential competitors from a vital portion of the online retail market for NFL Licensed Products (namely, the Amazon Marketplace).

**B. Fanatics Prohibited its Suppliers from Selling to its Competitors.**

146. Fanatics' market share renders its purchases of NFL Licensed Products vital to many manufacturers' financial success. Fanatics leverages this market power to strong arm its suppliers into cutting off the supply of NFL Licensed Products to prevent effective competition from <u>all</u> other online retailers—even those retailers that sell online through their own websites and the even fewer retailers that are approved to sell NFL Licensed Products on the Amazon Marketplace.

---

[45] Sam Carp, *Report: NFL and Amazon Grow Ties with Expanded Merchandise Partnership*, Sports Pro Media (Mar. 25, 2021), https://www.sportspromedia.com/news/nfl-amazon-merchandise-ecommerce-streaming-rights/.

CLASS ACTION COMPLAINT
CASE NO.

147.    Fanatics' agreements with the manufacturers that supply it with NFL Licensed Products require that if a manufacturer wants to sell to Fanatics, it must refuse to sell NFL Licensed Products to any other retailer who primarily sells online (the "No Online Retailers Policy"). These long-term agreements are written to be difficult for manufacturers to terminate. Dependent as they are on the sales volume Fanatics provides, manufacturers have little choice but to accept Fanatics' terms. Fanatics entered into at least two such agreements with licensee-manufacturers and further discovery is likely to uncover other instances of similar agreements.

148.    As with the No TPOM Sellers Policy, the No Online Retailers Policy is selectively applied such that manufacturers can still sell to Fanatics and Fanatics-affiliated entities, even though these entities primarily sell online.

149.    The effect of these coerced agreements is not only to deny Defendants' competitors access to inventory, thereby driving traffic to Fanatics-controlled online outlets, but also to restrict the number of customers for licensees' products, thereby rendering the licensees ever more dependent on Fanatics' business.

150.    Casey's was recently exposed to the effects of this policy. Casey's received an email from Logo Brands, a manufacturer of NFL Licensed Products and one of Casey's suppliers, requesting that Casey's remove all Logo Brands products from the Amazon Marketplace because of "contractual agreements." On May 20, 2021, Casey's emailed Logo Brands asking the latter to "shed some light of [sic] who these agreements are with."

151.    Logo Brands responded by email on May 24, 2021, demanding that Casey's remove products it had listed on Amazon due to a "new" "contractual agreement" Logo Brands had "just signed with Fanatics which prevents 3rd part[ies] from selling Logo Brands products on Amazon."

152.    On June 3, 2021, Logo Brands again demanded that Casey's remove its listings of Logo Brand products from the Amazon Marketplace due to an "agreement" between Logo Brands and Fanatics that directed Logo Brands not to sell products on the Amazon Marketplace

33

CLASS ACTION COMPLAINT
CASE NO.

or to allow any of their customers to do so. A high-ranking official at Logo Brands told Casey's

that the official had told Logo Brands' owners something like, "do you realize that we [Logo

Brands] are making a deal with the devil [Fanatics]?"

153.   Approved Marketplace Retailers have been similarly impacted by this policy. On

September 22, 2021, one of Casey's retailer customers related by email to a Casey's

representative that the customer had received an email from Logo Brands asking it to stop selling

items on Amazon. This customer then asked Casey's "to cancel the PO that I have placed with"

Casey's.

154.   On September 23, 2021, Casey's emailed a high-ranking representative of Logo

Brands to inquire about this situation, as Casey's customer was apparently an Approved

Marketplace Retailer. Later that day, the high-ranking representative of Logo Brands replied that

he would consider this and assumed that Casey's was referring to a specific Casey's customer

(which reflects how few Approved Marketplace Retailers there are). Then, on September 24,

2021, the high-ranking representative of Logo Brands emailed stating:

> We are not allowed any 3rd parties (except Fanatics) to ship NFL products to
> Amazon. This has nothing to do with [Casey's customer's] agreement with the
> NFL. The Logo Brands agreement with Fanatics is why he can't sell this.
>
> Please don't sell this guy anymore NFL products for him to sell Amazon [sic].

155.   On September 29, 2021, as described in an email to Casey's, this same customer

spoke to a Logo Brands representative who confirmed that Logo Brands has an exclusive deal

with Fanatics and requested that the customer "stock-down on" items then listed on the Amazon

Marketplace.

156.   On or around June 24, 2021, at the 2021 College Baseball World Series in

Omaha, Nebraska, a Casey's representative met with a high-level representative of WinCraft. This

representative reported that even if Casey's applied and was accepted as an Approved

Marketplace Retailer of NFL Licensed Products on Amazon, WinCraft would still refuse to sell

CLASS ACTION COMPLAINT
CASE NO.

its products to Casey's because Fanatics believed allowing Casey's to sell WinCraft's products on the Amazon Marketplace would be counter to Fanatics' business goals.

157.    The effect of the No Online Retailers Policy is the same as that of the No TPOM Sellers Policy: Fanatics' competitors, lacking NFL Licensed Products to sell, are driven off TPOMs.

158.    Fanatics also leverages its market power as a manufacturer to further its goal of blocking competitors from selling on TPOMs. For example, Fanatics' "Advertising Policy" imposes the following condition on all retailers of Fanatics' NFL Licensed Products:

> [T]he advertisement for sale by any Reseller of any Product on any Third-Party Website is prohibited. For purposes of this policy, a 'Third Party Website' is any website not owned, operated, and controlled by the Reseller, including, by way of example, and not limitation, eBay and Amazon.com.

159.    Because the policy defines advertisement to include "any website accessible to the public" on which both a product and a price appear, this provision effectively bars Fanatics' customers from selling Fanatics-manufactured NFL Licensed Products on TPOMs. Violators face penalties to be imposed "at the sole and absolute discretion of Fanatics" that can extend to an indefinite suspension of a retailer's ability to purchase Fanatics' products. In other words, Fanatics expressly threatens to cut off the supply of NFL Licensed Products manufactured by Fanatics to any retailer that lists them for sale on a TPOM. By enforcing this policy, Fanatics fulfills the same role as other manufacturers conscripted into Defendants' scheme—to deny inventory to retailers who might use TPOMs to compete with Fanatics for retail sales.

## C.    Defendants Conspired Through Domain Name Licensing.

160.    As a result of the conspiracy, Defendants' retail sales have increased at the expense of smaller retailers who have been effectively excluded from the online retail market for NFL Licensed Products. With far fewer competitors, Defendants no longer face meaningful price competition in the online retail market and prices have increased accordingly. To capitalize on

35

CLASS ACTION COMPLAINT
CASE NO.

the success of the group boycott and further consolidate their market power, Defendants implemented a domain-name licensing scheme.

161.   In a competitive market, firms will use price as a method of competition to capture additional market share. In the online retail market for NFL Licensed Products, one would expect competing retailers selling highly similar products, such as Fanatics.com, the NFL's online store, the online stores of individual NFL Teams, and Fanatics' and the NFL's retail operations on TPOMs to compete with one another on the basis of price.

162.   Instead of competing with one another, however most of the NFL Defendants have collectively agreed to withdraw from the market in favor of allowing Fanatics to operate as a monopolist. In return, Fanatics' shares its monopoly profits with the Teams.

163.   Instead of competing for sales, Defendants have simply handed Fanatics the proverbial keys to their stores. The NFL (through NFLP and/or NFL Enterprises), for example, now licenses its domain at "NFLShop.com" to Fanatics; Fanatics operates the site just as it operates its "Fanatics.com" storefront, selling the same NFL products at the same prices. Twenty-six of the thirty-two individual Teams (each of whom formerly competed with Fanatics and each other) do the same.

164.   Thus, in addition to its own online retail websites, Fanatics currently operates the e-commerce websites of the NFL (NFLshop.com) and a majority of the Teams:

- Jetsshop.com
- Ramsfanshop.com
- Shop.azcardinals.com
- Shop.buccaneers.com
- Shop.chiefs.com
- Shop.clevelandbrowns.com
- shop.denverbroncos.com

- Shop.miamidolphins.com
- Shop.colts.com
- Store.chicagobears.com
- Shop.panthers.com
- Shop.chargers.com
- Shop.atlantafalcons.com
- Store.washingtonfootball.com

CLASS ACTION COMPLAINT
CASE NO.

- Shop.giants.com
- Shop.houstontexans.com
- Shop.jaguars.com
- Shop.neworleanssaints.com
- Shop49ers.com
- Shop.bengals.com

- Shop.detroitlions.com
- Shop.baltimoreravens.com
- Proshop.seahawks.com
- Proshop.patriots.com
- Store.philadelphiaeagles.com
- Shop.dallascowboys.com

165.    For example, in 2021, the Dallas Cowboys and Fanatics signed a ten-year exclusive merchandise agreement under which Fanatics would operate the Dallas Cowboys Pro Shop, which carries NFL Licensed Products. The new Fanatics-operated website (which replaced the Cowboys' own retail site) went live on September 17, 2021.[46]

166.    The result is that each of these websites is now a Fanatics website, where Fanatics sells NFL Licensed Products at monopoly prices, the profits from which are then shared with former competitors (the NFL and the Teams) via licensing fees and/or royalties on sales.

167.    The purported competition among Fanatics and the NFL Defendants in the online retail market for NFL Licensed Products now exists in (domain) name only. Defendants' arrangement is no different than McDonald's employees selling Big Macs and McRib sandwiches inside a restaurant building bearing the "Burger King" name and logo.

168.    These domain-name licensing agreements are anticompetitive when used, as here, by horizontal competitors to consolidate a monopoly in a chosen conspirator, who then shares the profits with its competitors that are in on the scheme.

---

[46] Rory Jones, *Dallas Cowboys Get New Online Store in Ten-Year Fanatics Merchandise Deal*, SportsPro (Sept. 20, 2021), https://www.sportspromedia.com/news/dallas-cowboys-fanatics-online-store-ecommerce-merchandise-nfl/.

37

CLASS ACTION COMPLAINT
CASE NO.

**D.     Defendants Prohibit Competing Retailers from Using NFL-Related Keywords in Online Advertising.**

169.     The ability to search for content by entering keywords into a database that then returns webpages containing matching content is a fundamental feature of the internet. In terms of online retail, those seeking to sell products online use keywords in their product listings that match the words that sellers anticipate consumers will use when searching for such products.

170.     On the most popular search engine, Google.com, sellers can advertise their products in two ways. First, if terms used on the sellers' webpage match those used in a consumer's search, the sellers' page will be returned among the search results. However, because there are many, many webpages containing information about the NFL and its teams, this mechanism is of less importance than the second: search advertising.

171.     Search advertising is the advertising that appears on the results page after a user runs a search on a search engine, generally before or otherwise more prominently displayed than the regular search results.

172.     On Google, sellers participate in auctions for the right to have links to their pages appear as search advertising. In this process, Google offers advertising space to advertisers whose keywords match the search; the links of the advertisers with the winning bids are then displayed as search advertising.

173.     The NFL Defendants have prevented competing retailers of NFL Licensed Products from using NFL-related keywords to bid in these auctions while allowing themselves and Fanatics to do so. The result is that consumer traffic is driven to Defendants' online stores and away from those of competing retailers.

174.     On the Amazon Marketplace, consumers also locate products through keyword searches; Amazon's algorithm then returns products matching the consumers' keywords. Thus, for a product to be visible on the Marketplace, the listing of the product must contain keywords

38

CLASS ACTION COMPLAINT
CASE NO.

accurately describing the product and that match those that a consumer would use if the consumer wanted to purchase that product or a similar one.

175. However, the NFL Defendants prevent competing retailers from using NFL-related keywords necessary to render those retailers' offerings visible to consumers on the Amazon Marketplace. So, for instance, Fanatics can list products using keywords such as "NFL" or the names of individual teams, but competing retailers can only describe their products generically. For example, instead of being able to describe a product as a "Miami Dolphins Shot Glass," a retailer might be limited to calling it a "shot glass."

176. Because the reason for purchasing an NFL Licensed Product is to express loyalty to a team, consumers will almost invariably search for NFL Licensed Products by using keywords related to the NFL or the team of interest. By prohibiting retailers from using those terms when listing their products, the NFL Defendants effectively render those listings invisible to consumers.

177. Hence, even retailers who are allowed to operate online or on TPOMs face reduced access to that market because consumers cannot find the retailers' products. This situation benefits Fanatics and the NFL Defendants, whose products do appear in search results on both Google and the Amazon Marketplace.

178. The NFL Defendants thus leverage their control over the intellectual property of the NFL and the Teams to exclude retailers who compete with the NFL Defendants from the online market for NFL Licensed Products.

179. These policies are collectively known herein as the "No NFL Keywords Policy."

**E.    Non-Economic Evidence Supports the Existence of a Conspiracy.**

180. Non-economic evidence supports the conclusion that Defendants conspired to boycott competing online retailers of NFL Licensed Products.

181. *First*, there is substantial direct and circumstantial evidence of collusion. Fanatics unabashedly broadcast its intentions to enforce the group boycott against licensees who hesitate

CLASS ACTION COMPLAINT
CASE NO.

to comply with Defendants' demands. At least one licensee, in turn, identified Fanatics' role in the conspiracy to its own customers in an effort to excuse the licensee's termination of long-standing business relationships.

182.    Casey's specifically asked licensees why it was being prevented from using TPOMs to sell products that it had already lawfully purchased and from selling those products to retailers using TPOMs to sell to consumers. Licensees replied that they were operating under the direction of Fanatics and NFLP. According to a now-former licensee, NFLP would send letters informing licensees if their products were being sold on TPOMs.

183.    For example, in October 2020, manufacturer WinCraft told Casey's that WinCraft was "acting on behalf of Fanatics" when ordering Casey's to remove 2000 WinCraft items from Casey's Amazon Marketplace store. As discussed above, Fanatics bought WinCraft shortly thereafter.

184.    Evidence also shows collusion among licensees implementing the No TPOM Sellers Policy. In late February 2021, a hardgoods manufacturer who had been informed by NFLP that its license would not be renewed told Casey's that there was an understanding among licensees that they would each enforce the policy against retailers (and the distributors servicing those retailers) who sold NFL Licensed Products on the Amazon Marketplace.

185.    That understanding was key to the conspiracy's success. If some licensees failed to enforce the No TPOM Sellers Policy, those licensees that did enforce it would be placed at a competitive disadvantage, as they would lose sales and market share to competing licensees who had continued supplying retailers selling on TPOMs.

186.    Other documentary evidence discussed above demonstrates that Fanatics, with the support of the NFL Defendants, monitored compliance with the No TPOM Sellers Policy. Fanatics effectively forced licensees to participate in the boycott and even compelled them to divulge confidential information about their clients' purchases and sales. And, of course,

40

CLASS ACTION COMPLAINT
CASE NO.

Fanatics was the driving force behind the No Online Retailers Policy, which required licensees' cooperation.

187.     *Second*, Defendants took advantage of numerous opportunities to conspire. The NFL Defendants hold regular meetings attended by all Teams at which common business matters are discussed; though the meetings themselves are widely acknowledged, the discussions at those meetings are kept strictly confidential. It is certainly plausible that the formation, operation, and policing of the anticompetitive scheme was discussed during these meetings.

188.     Defendants also had ample opportunity to meet and collude at regular trade association meetings and conferences, such as the annual Sports Licensing and Tailgate Show that Fanatics, NFLP, and the Teams regularly attend.[47]

189.     Rubin, himself a partial owner of several major professional sports franchises, also maintains close personal relationships with key members of the NFL such as Robert Kraft and the Kraft family, owners of the NFL's New England Patriots, whom Rubin has publicly called "family to me."[48]

190.     Rubin and Kraft speak regularly: "Literally, I [Rubin] talk to him [Kraft] multiple times a day."[49] Rubin has also described Kraft as "one of my closest guy friends"[50] and claimed the two are "together all the time."[51] He even once boasted in an interview, "we were just in Vegas last weekend."[52] They are so close that Rubin gave Kraft a rare Bentley for his eightieth birthday.

---

[47] *About the Show*, Sports Licensing & Tailgate Show, https://sportstailgateshow.com/show-info/about-the-show/ (last visited Dec. 18, 2021).
[48] *Social Media Marketing Helps Boost Sports Merchandise Sales*, CNBC: Squawk Box (Feb. 6, 2019), https://www.cnbc.com/video/2019/09/06/nfl-sports-merchandise-sales-fanatics-squawk-box.html.
[49] The Corp, *Interview with 76ers and New Jersey Devils Owner Michael Rubin*, YouTube (Dec. 31, 2018), https://www.youtube.com/watch?v=sI2eXeyu3KY.
[50] *Id.*
[51] *Id.*
[52] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

191.    Kraft sits on the NFL's prestigious Chairman's Committee and is considered one of the most influential owners in the NFL. Kraft has publicly stated his belief that the Teams must act collectively on all matters: "What I've learned over the last 21 years is the heart and soul and strength of the NFL . . . is the partnership of the 32 teams."[53]

192.    Kraft's son Jonathan, the Patriots' President, is also Rubin's personal friend. As a member of the NFL's Business Ventures Committee, Jonathan Kraft is well placed to promote policies favorable to Fanatics and that facilitate coordination between Fanatics and the NFL Defendants.

193.    *Third*, the Teams' revenue sharing of the proceeds from the licensing of the Teams' intellectual property rights creates strong financial incentives to collude rather than compete. NFLP, for example, is a walking horizontal conspiracy among competitors formed for the very purpose of organizing group-wide agreements between Teams that otherwise would compete among themselves to license their trademarks to competing manufacturers and retailers.

194.    *Fourth*, that the No TPOM Sellers, No Online Retailers, and No NFL Keywords Policies were designed to drive Defendants' competitors from the online market for NFL Licensed Products (rather than serve any lawful purpose) is evidenced by the fact that those policies have not been enforced against Fanatics and other favored retailers. Licensees were told that Fanatics was to get "special treatment" and would not be subject to the policies.

195.    Like Fanatics, FOCO, a manufacturer of NFL Licensed Products, was allowed to continue selling its products on the Amazon Marketplace even while FOCO was simultaneously enforcing the No TPOM Sellers Policy against other retailers that it supplied.

196.    Conversely, the policies <u>were</u> enforced against competitors even where they did not apply. For instance, Defendants prohibited sales to Amazon, purportedly under the No

---

[53] Tim Dahlberg, Column, *In the End, the NFL Cartel Is What Matters Most*, USA Today (May 20, 2015), https://www.usatoday.com/story/sports/nfl/2015/05/20/column-in-the-end-the-nfl-cartel-is-what-matters-most/27668517/.

CLASS ACTION COMPLAINT
CASE NO.

TPOM Sellers Policy even though, because Amazon is a retailer, sales on its own website do not violate that policy.

197.    *Fifth*, Defendants established and operated a mechanism to police and enforce the conspiracy via "compliance trackers" that tracked the number of products and sellers who had been removed and/or boycotted from selling NFL Licensed Products on TPOMs. Those trackers were shared between Defendants in an effort to enforce the conspiracy with maximum efficiency.

198.    *Sixth*, Defendants had a strong motive to conspire. As TPOMs became more and more popular with consumers, Defendants risked their products becoming commoditized as competing retailers participated in a race to the bottom on pricing. To meet that threat lawfully would have required that Defendants cut prices, offer fast and free shipping, and/or undertake marketing campaigns to drive online sales at their sites instead of on TPOMs. Defendants chose none of the above, opting instead to use their market power to eradicate their smaller competitors. Doing so, however, required that Defendants conspire with one another as described in this Complaint.

### F.    Economic Evidence Supports the Existence of a Conspiracy.

199.    In addition to the evidence outlined above, economic evidence supports the existence of Defendants' conspiracy to boycott competing retailers and remove them from the online market for NFL Licensed Products.

200.    Over the last five years, the market for NFL Licensed Products has experienced only minimal growth. In public interviews, Rubin has admitted that the size of the licensed sports industry has remained largely constant, but that instead of trying to grow the overall market, Fanatics' focus is just on increasing its "share of the closet," *i.e.*, taking market share from other retailers.[54]

---

[54] *Michael Rubin Interview*, Forbes: Sports Money (Sep. 30, 2020), https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=15b496cf1147 (hereinafter "*Sports Money Interview*").

43

CLASS ACTION COMPLAINT
CASE NO.

201.     Despite the lack of growth in the market overall, the revenues Fanatics and the NFL Defendants received from the sale of NFL Licensed Products have grown dramatically. As noted above, the NFL Defendants experienced a 10-fold growth in their own retail sales following the start of the conspiracy period.

202.     Faced with static or slowly growing demand, firms should attempt to undercut one another's prices. However, the fear of lower prices and lower profit margins incentivizes collusive behavior to preserve profits.

### 1.     Defendants' Prices Increased Over the Conspiracy Period.

203.     Market data indicates that prices for NFL Licensed Products were trending downward before the beginning of the conspiracy but reversed course once Defendants began to collude. Discovery is likely to reveal that these price increases have not been driven by input costs given the long-term macroeconomic trends in input prices coupled with Fanatics' purchasing power (i.e., Fanatics' ability as a manufacturer to dictate price terms with suppliers). These increases also coincide with booming growth in online retail generally, which, all else being equal, should enhance price competition. Increasing prices, therefore, are inconsistent a competitive market environment and demonstrate that the market has been distorted by anticompetitive conduct.

### 2.     Defendants' Conduct Ran Counter to Their Own Economic Self-Interests in the Absence of a Conspiracy.

204.     In the absence of a conspiracy promising the ability to set monopoly pricing, each Team would compete to sell NFL Licensed Products. The Teams, acting as independent licensors, would rationally want to make their NFL Licensed Products available to as many fans as possible. Instead of doing so, Defendants colluded to terminate or threaten to terminate prior profitable business dealings with licensees and retailers.

CLASS ACTION COMPLAINT
CASE NO.

205.    The only rational explanation is that Defendants expected to make even more money by driving their competitors out of the online retail market for NFL Licensed Products, after which Defendants could impose much higher, supracompetitive prices.

206.    The licensees caught up in Defendants' scheme were also forced to act against their own interests. It would not have made economic sense for an individual licensee to have followed the No TPOM Sellers Policy without assurance or an agreement that competing licensees would also follow that policy; otherwise, the individual licensee would have lost sales and market share to competitors who did not enforce the policy. Nor would an individual licensee agree to enforce the conspiracy without an assurance that other conspirators, primarily Fanatics, would step up their purchases to offset those lost when licensees could no longer sell to retailers operating on TPOMs.

207.    Most retailers who sell on TPOMs are smaller retailers with less buying power. As a result, those retailers typically pay manufacturers more for their products than do larger retailers like Defendants. Such retailers also tend to compete for customers by offering lower prices.

208.    Accordingly, from the perspective of the manufacturers, selling to discounting retailers who sell on TPOMs has the potential to make more money per item and to lead to more items sold (due to the lower end consumer prices). It was only because of the group boycott and pressure exerted on the licensees (along with Defendants' promises to "make up" for lost sales) that the licensees agreed to cut off retailers selling NFL Licensed Products on TPOMs.

209.    Finally, neither Fanatics nor any individual Team could enforce a boycott single-handedly because the threatened licensee could continue to produce and sell NFL Licensed Products bearing the logos of other Teams. The loss of one Team's license would thus not be a large enough threat to convince a licensee to terminate all sales of NFL Licensed Products to retailers selling on TPOMs. It is only because the NFL Defendants and Fanatics agreed to operate in unison that the threat to the licensees was viable.

45

CLASS ACTION COMPLAINT
CASE NO.

210.    Defendants also engaged in conduct inconsistent with their independent self-interest by, among other things, revealing to each other proprietary technological information and sensitive internal commercial information, including data on consumer preferences. Such information is among a company's most valuable assets. In a truly competitive environment, protecting those essential resources is critical to maintaining a company's competitive edge. In the absence of agreement, each Defendant would have kept its proprietary information secret and used it to innovate and attract consumers to its own products. The fact that Defendants did not do so supports the existence of a conspiracy.

## VIII.   ANTICOMPETITIVE EFFECTS AND LACK OF PRO-COMPETITIVE JUSTIFICATIONS

### A.    Defendants' Profited from their Anticompetitive Conduct.

211.    Evidence shows that Fanatics benefited significantly from the enforcement of the No TPOM Sellers and No Online Retailers Policies. In 2020, for example, Fanatics' e-commerce sales grew by 30% even though every sports league in the world played dramatically fewer games and saw a huge reduction in revenue because of the COVID-19 pandemic.

212.    Constrained by the No TPOM Sellers and No Online Retailers Policies, manufacturers, whether under threat of losing their licenses from the Teams or under threat of losing Fanatics as a customer, refuse to allow retailers that compete with Defendants to sell NFL Licensed Products on TPOMs. When consumers cannot find NFL Licensed Products on TPOMs, they are driven to shop on Fanatics-owned or operated websites, where they pay supracompetitive prices. Defendants amplified the effect of these policies through the No NFL Keywords Policy, which made it more difficult for consumers to find the websites or product offerings of competing retailers, thus driving consumers towards Fanatics-owned or operated websites. And because these websites also expose consumers to more Fanatics-produced goods, Fanatics benefits as a manufacturer as well.

CLASS ACTION COMPLAINT
CASE NO.

213.    The anticompetitive conspiracy alleged in this Complaint thus represents a hat trick for Fanatics: It receives a larger share of the market for online retail sales of NFL Licensed Products, sells more of the NFL Licensed Products it manufacturers, and is able to charge monopoly prices for all of those products—all because Defendants have successfully boycotted other retailers from TPOMs.

214.    The NFL Defendants receive a share of Fanatics' monopoly rents through licensing fees and increased royalty revenue, both in absolute dollars and as a percentage of sales. Rubin explained it this way:

> They get a cut of everything we sell. So the more we sell, the more money they/we make and I can tell you, the growth we've seen in both the NFL and MLB in this partnership has been, I think in a lot of ways better than anyone expected.[55]

**B.    Defendants' Scheme has had Significant Anticompetitive Effects.**

215.    The conspiracy's purpose was to allow Defendants to corner the online retail market for NFL Licensed Products so that they could impose monopoly pricing on consumers without meaningful competitive restraints. It has worked as planned.

216.    When free and open to competition, TPOMs facilitate smaller or newer retailers' entrance into the online market and their ability to compete with established retailers on the basis of price or quality. Conversely, excluding retailers from TPOMs impairs competition.

217.    Colluding to stifle and eradicate smaller retailers from TPOMs benefits Defendants in a number of ways.

218.    *First*, and most obviously, it reduces the potential options for a consumer who wants to buy NFL Licensed Products, driving more consumers to purchase from Defendants. Rubin admits that "if you have exclusive unique merchandise then consumers and fans come to you to buy that merchandise."[56] The reality, however, is that a Denver Broncos t-shirt can only be so "unique." Defendants' solution is simply to make NFL Licensed Products unavailable on

---

[55] *Sports Money Interview*, *supra*.
[56] TC Video, *supra*.

47

CLASS ACTION COMPLAINT
CASE NO.

TPOMs from competing sellers. When you are the only one selling it, even a highly fungible product becomes "unique".

219.    *Second*, Defendants can charge those customers more because eradicating smaller retailers from TPOMs means far less price competition in the online marketplace. According to Rubin, "[t]he Leagues and Teams make a lot more money in this business than they used to make under the old model."[57]

220.    *Third*, Defendants face far less pressure to compete on price indirectly by offering free shipping (as do many retailers on TPOMs). As discussed above, Fanatics continues to charge large amounts in shipping fees, despite other retailers and TPOMs offering free or inexpensive shipping to compete for customers.

221.    *Fourth*, because direct-to-consumer sales generate data about consumers, the NFL is able to leverage the greater consumer traffic going to websites controlled by Defendants to gather data that would, as Rubin puts it, "drive all aspects of their business."[58]

**C.    There Are No Procompetitive Justifications for Defendants' Collusion.**

222.    Because Defendants' collusion to impose a horizontal boycott of competing retailers is *per se* illegal, any procompetitive justifications for Defendants' conduct are irrelevant.

223.    Even if procompetitive justifications were relevant (and they are not), there simply are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint or for any individual aspect of Defendants' conspiracy. And even if there were, less restrictive means of achieving those purported procompetitive effects do exist. To the extent that Defendants' conduct has any cognizable procompetitive effects, they are far outweighed by the harm to competition and consumer welfare described in this Complaint.

224.    There is no dispute that there are areas where the Teams may permissibly cooperate. The classic examples of permitted concerted action within sports leagues include

[57] *Interview with Michael Rubin*, Jeffrey S. Moorab Ctr. for the Study of Sports L. (Apr. 12, 2019), https://www1.villanova.edu/villanova/law/academics/sportslaw/events/lectures.html.
[58] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

setting the rules of play and scheduling competitions. But there are no procompetitive

justifications for the Teams' collusion with each other and Fanatics to exclude competing

retailers from the online market for NFL Licensed Products.

225. The Teams have a legitimate interest in protecting their intellectual property from

infringement through the sale of counterfeit products. However, Defendants' conspiracy does

nothing to further that interest. The Teams already can, and do, insist that their licensees not sell

to retailers that also sell counterfeit or unlicensed versions of NFL Licensed Products. Moreover,

TPOMs have policies in place specifically designed to combat counterfeiting.[59] eBay, for

instance, sanctions sellers of counterfeit items:

> Activity that doesn't follow eBay policy could result in a range of actions including
> for example: administratively ending or canceling listings, hiding or demoting all
> listings from search results, lowering seller rating, buying or selling restrictions,
> loss of buyer or seller protections, and account suspension. All fees paid or payable
> in relation to listings or accounts on which we take any action will not be refunded
> or otherwise credited to your account.[60]

Given the importance of high seller ratings, favorable placement in listings, and the ability to

continue selling on TPOMs, such policies render it less likely, not more, that retailers selling on

TPOMs would jeopardize their businesses by selling counterfeit versions of NFL Licensed

Products.

226. Rather than reducing the presence of counterfeit goods, Defendants' concerted

action instead targets those competitors retailing legitimate NFL Licensed Products

manufactured by and purchased from approved licensees. For example, Casey's does not sell

counterfeit goods, has never been accused of selling counterfeit goods, and has no intention of

selling counterfeit goods in the future. Yet, Casey's is prohibited from selling NFL Licensed

Products on the Amazon Marketplace.

---

[59] *See, e.g.*, *Amazon Anti-Counterfeiting Policy*, Amazon Seller Central,
https://sellercentral.amazon.com/gp/help/external/201165970 (last visited Aug. 17, 2021).
[60] *Counterfeit Item Policy*, eBay, https://www.ebay.com/help/policies/prohibited-restricted-items/counterfeit-item-policy?id=4276 (last visited Aug. 17, 2021).

CLASS ACTION COMPLAINT
CASE NO.

227.    The Merchandise Agreement's purported objective—to "improve the selection of NFL licensed products on the Amazon.com marketplace . . . and to protect the NFL brand by ensuring a premium presentation of NFL licensed products and a high level of customer service to purchasers of NFL licensed products"—is also pretextual.

228.    Jeff Bezos, Amazon's founder and CEO, testified before the House Judiciary Committee that third-party sellers on Amazon's platform increase product selection and improve customer satisfaction:

> But we committed to the idea that over the long term [allowing third-party sales] would increase selection for customers, and that more satisfied customers would be great for both third-party sellers and for Amazon. And that's what happened. Within a year of adding those sellers, third-party sales accounted for 5% of unit sales, and it quickly became clear that **customers loved the convenience of being able to shop for the best products and to see prices from different sellers** all in the same store. These small and medium-sized third-party businesses now add significantly more product selection to Amazon's stores than Amazon's own retail operation.[61]

229.    In Bezos' words, and in contradiction of Defendants' purported justifications, after the introduction of third-party sellers "the whole pie did grow, third-party sellers did very well and are growing fast, and that has been great for customers and for Amazon.[62] It just hasn't been great for Fanatics or the Teams.

230.    The No Online Retailers Policy similarly lacks a procompetitive justification. Online retailers of necessity are highly visible and can be easily located through internet searches. This fact renders it less likely that such retailers would sell counterfeit products than brick-and-mortar retailers whose operations could escape notice unless their stores were physically visited and inspected. Moreover, because of the heavy competition between online

---

[61] *Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the H. Comm. on the Judiciary Subcomm. on Antitrust, Commercial & Administrative Law*, 116th Cong. (statement of Jeffery P. Bezos), https://www.congress.gov/116/meeting/house/110883/witnesses/HHRG-116-JU05-Wstate-BezosJ-20200729.pdf (emphasis added).

[62] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

retailers, such retailers are incentivized to offer better, not worse, customer service; thus, the exclusion of such retailers does not encourage higher customer service that would enhance the value of the NFL brand.

231.    Likewise, there are no procompetitive justifications for the No NFL Keywords Policy, as there is no procompetitive reason to prevent retailers from accurately describing their product offerings or advertising them in terms that will allow consumers to locate those offerings. If the retailers can be allowed to sell NFL Licensed Products online, there is no procompetitive reason that would warrant preventing them from using the same terms encompassed by that license to advertise or describe those products.

232.    Fanatics' performance provides further confirmation that any goal of improving the customer experience is pretext. For example, the Better Business Bureau lists 464 complaints in the past three years for "Fanatics Retail Group" with an average Customer Review Rating of 3.42/5 stars;[63] and 316 complaints in the past three years for "Fanatics, Inc." with an average Customer Review Rating of 1.09/5 stars.[64] Common complaints include problems with customer service, shipping delays, and product defects.[65] Fanatics' reviews on Amazon are also relatively poor. Improved competition in the market would naturally diminish the frequency of such complaints because market participants would compete to improve the quality of their products and their customer service.

---

[63] *Business Profile: Fanatics Retail Group*, Better Bus. Bureau, https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-retail-group-0403-29000877 (last visited Dec. 18, 2021).
[64] *Business Profile: Fanatics, Inc.*, Better Bus. Bureau, https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-235965780 (last visited Dec. 18, 2021).
[65] *See Complaints: Fanatics, Inc.*, Better Bus. Bureau, https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-235965780/complaints (last visited Dec. 18, 2021).

CLASS ACTION COMPLAINT
CASE NO.

**D.    Defendants' No TPOM Sellers, No Online Retailers, and No NFL Keywords Policies Violate Antitrust Law.**

233.    Defendants reached a horizontal agreement among themselves as retailers to boycott competitors and allocate the market for online retail sales of NFL Licensed Products by agreeing to enforce the No TPOM Sellers Policy. Defendants' agreement and enforcement of policies that prevent other retailers from competing in the online retail market for NFL Licensed Products constitutes a *per se* violation of the Sherman Act.

234.    Through both the No TPOM Sellers Policy and its self-proclaimed exclusive right to determine who may sell NFL Licensed Products on TPOMs, NFLP (acting on behalf of the Teams) is able to restrict the number of retailers operating on TPOMs. Because TPOMs are so critical to the success of online retail, this restriction has the effect of reducing the number of viable competitors to Defendants in the online market for retail sales of NFL Licensed Products. These policies are designed to allow NFLP to reach downwards to restrict the conduct of retailers—especially those that lack privity with NFLP and so are insulated from NFLP's direct influence. As the AMRA indicates:

> NFL Properties LLC ("NFLP") obligates its consumer products licensees ("Licensees") to ensure the retailers that sell such Licensee's NFL licensed products via e-commerce maintain control over, and responsibility for, the e-commerce transactional environment, and refrain from selling their NFL licensed products under a third-party URL, without the prior written approval of NFLP.

In other words, through NFLP, the Teams unlawfully leverage their license-renewal powers to cause licensees to enforce the Teams' will over competing retailers whom NFLP could not otherwise control.

235.    Unlike its effect on competing retailers, the NFLP's restriction on selling on the Amazon Marketplace does not negatively impact Fanatics. Rather, Fanatics' market power is greatly enhanced. Through both TPOMs and its own e-commerce sites, Fanatics can satisfy the demand left unfilled by the exclusion of competitor retailers from the online market for Licensed NFL Sports Products.

CLASS ACTION COMPLAINT
CASE NO.

236.     Even though it was NFLP that threatened to withhold licenses if manufacturers did not enforce the No TPOM Sellers Policy, NFLP is controlled by the competitor Teams. The Teams' agreement to enforce the No TPOM Sellers Policy thus constitutes a second horizontal agreement among competitors.

237.     Fanatics engaged in additional anticompetitive conduct by requiring manufacturers to agree to enforce the No Online Retailers Policy. The intent and effect are the same as with the No TPOM Sellers Policy; to manipulate licensees into cutting off the supply of NFL Licensed Products to Defendants' competitors.

238.     By rendering competing retailers' offerings of NFL Licensed Products difficult if not impossible to locate online, the No NFL Keywords Policy is also anticompetitive. The NFL Defendants have thus weaponized control over their intellectual property to prevent use of that property to sell products whose very essence is the display of that property. The effect replicates that of the other policies—driving consumers towards Defendants' online retail sites and away from those of Defendants' competitors.

239.     On information and belief, Fanatics has entered into agreements with licensees similar to those described above with WinCraft and Logo Brands. These agreements require licensees to cut of the supply of NFL Licensed Products to online retailers (other than Defendants and selected nonboycotted retailers). Fanatics can impose these agreements on licensees because of its dominant market power in the online retail market for NFL Licensed Products. In order for licensees to remain profitable, they must be able to sell their goods to Fanatics and cannot refuse whatever conditions Fanatics cares to impose.

240.     The anticompetitive conduct described in this Complaint has caused consumers to pay higher prices for NFL Licensed Products and discouraged new entrants into the online retail market for those products.

241.     In the alternative, the No TPOM Sellers, No Online Retailers, and No NFL Keywords Policies produced anticompetitive effects that substantially outweighed any asserted

CLASS ACTION COMPLAINT
CASE NO.

1    pro-competitive justifications and/or were not the least-restrict methods to achieve any asserted

2    pro-competitive justifications.

3        242.    European regulatory authorities, applying legal principles analogous to those

4    found in U.S. antitrust law, have agreed that policies similar to the No TPOM Sellers Policy are

5    anticompetitive. For example, in April 2014, Andreas Mundt, president of the German

6    Bundeskartellamt, declared that policies that prohibit retailers from selling on TPOMs are

7    "restricting competition."[66] When commenting on such a policy implemented by ASICS, a

8    manufacturer of sports shoes and apparel, Mundt indicated that "'ASICS' distribution system in

9    its current form primarily serves to control price competition in both online and offline sales.'"[67]

10   At the time, Mundt "suggested . . . that other manufacturers were using similar techniques."[68]

11   And indeed they were. Adidas, another sports clothing brand, had prohibited sales of its products

12   on TPOMs in 2012 but lifted the prohibition in July 2014, mere weeks after the announcement of

13   a Bundeskartellamt investigation.[69]

14          **E.    The Conspiracy has Harmed Plaintiffs and the Members of the Class.**

15       243.    As a proximate result of Defendants' scheme, distributors and retailers have lost

16   significant sales in the online retail market for NFL Licensed Products. Fewer online retailers of

17   NFL Licensed Products competing for consumer purchases have led to higher prices, reduced

18   supply, decreased selection, and poorer customer service.

19       244.    Suppliers of NFL Licensed Products have fewer retailers to whom they can sell,

20   and consumers end up paying higher prices for a smaller selection of products. Thus,

21   Defendants' collusion has proximately caused, and continues to cause, harm to Plaintiffs and the

22

23   [66] Jonathan Randles, *Adidas to Ease Online Sales Restrictions Amid Scrutiny*, Law360 (July 1,
     2014, 4:15 PM), https://www.law360.com/articles/553507/adidas-to-ease-online-sales-
24   restrictions-amid-scrutiny. The Bundeskartellamt is an independent competition authority whose
     task is to protect competition in Germany. *See* Bundeskartellamt,
25   https://www.bundeskartellamt.de/EN (last visited Dec. 18, 2021).
     [67] Randles, *supra*.
26   [68] *Id.*
     [69] *Id.*
27
                                                54
28   CLASS ACTION COMPLAINT
     CASE NO.

members of the Class in several respects, including limited consumer choice and supra-competitive prices for those products that remain available.

245.    The resulting damages include, without limitation, the difference in price class members paid (including shipping costs) to purchase NFL Licensed Products from Defendants compared to what the prices would have been in a non-collusive, competitive market for those products.

## IX.    MARKET DEFINITION AND MARKET POWER

246.    The relevant geographic market for the Class is the United States.

247.    The relevant product market for the Class is the online retail market for new NFL Licensed Products.

248.    Defendants are horizontal competitors in the relevant market and have market power.

### A.    A Distinct Market Exists for Online Sales of New NFL Licensed Products.

#### 1.    Online vs. Brick and Mortar

249.    The online retail market is distinct from the brick-and-mortar retail market. As Rubin recognizes, e-commerce is the "most efficient vehicle" for reaching customers and growing sales.[70]

250.    The practices of experts in the licensed sports products industry support the existence of a separate online market. Such experts track and report revenues and other economic indicators for online markets separate and apart from statistics for brick-and-mortar retail.

251.    Because of the unique features of online retail, NFL Licensed Products purchased from brick-and-mortar retailers are not an adequate substitute for NFL Licensed Products purchased from online retailers. These unique features include:

(a)    **Convenience**. Online retail marketplaces give consumers the ability to purchase items and have those items shipped directly to their homes without needing to travel to

---

[70] TC Video, *supra*.

CLASS ACTION COMPLAINT
CASE NO.

a physical location; allow consumers to shop at any time rather than only when a physical store happens to be open; and enable consumers to avoid the inconvenience and potential health hazards associated with crowds.[71] Conversely, brick-and-mortar retail locations provide the convenience of not having shipping delays for customers that need immediate access to NFL Licensed Products.

(b)     **Selection**. Online retail marketplaces give consumers access to a larger volume and variety of merchandise. As Rubin explains, "[t]he advent of the internet allowed this incredible availability of inventory to serve every fan for whatever team they want, whatever player they want, whatever gender they want, whatever color they want."[72]

(c)     **Geographically unlimited**. Online retail marketplaces make it possible for consumers to purchase NFL Licensed Products from geographically distant teams that lack the national followings that make certain Teams' products available irrespective of geography (e.g., the Dallas Cowboys or the Pittsburgh Steelers). According to Rubin, online retail of NFL Licensed Products has been successful in part because "there were so many fans that live[] in different markets from the team that they were a fan of and they c[a]n't find that merchandise."[73]

(d)     **Data Collection**. Online retail marketplaces give retailers the ability to collect more and higher quality data regarding consumer behavior to anticipate fans' desires more accurately and to have the correct product mix available.

(e)     **Virtual Shelf Space**. Online retail marketplaces allow sellers to offer a greater variety of merchandise without the expense of acquiring and maintaining the additional display space that would otherwise be needed at a physical retail location.

(f)     **Agility**. Online retail marketplaces help retailers make new products or products for which demand has unexpectedly increased available more quickly than is possible

---

[71] This benefit of online retail has been amplified during the COVID-19 pandemic.
[72] NBC Sports Phila., *supra*.
[73] *The Rich Eisen Show*, YouTube, (Sep. 18, 2019), https://www.youtube.com/watch?v= mPVPBItYVd4.

CLASS ACTION COMPLAINT
CASE NO.

in brick-and-mortar stores. For instance, if a player makes an impressive play in a nationally televised game, demand for products bearing that player's name often spikes; this demand can be more easily satisfied by retailers that do not have to first acquire and display products in a brick-and-mortar store before they can be sold to satisfy that demand.

252.    For these and other reasons, there is an inelasticity of demand between products available for purchase online and those that can be purchased at brick-and-mortar stores. As a result, prices available at brick-and-mortar stores do not meaningfully constrain the prices charged by online retailers.

253.    Retailers within the online market for NFL Licensed Products look to other online retailers when determining what prices or other features are necessary in order to compete.

254.    Although online retail is typically assumed to have lower barriers to entry than brick-and-mortar retail, some barriers are still significant, including:

(a)    New retailers' need to acquire NFL Licensed Products from the limited number of licensees and their distributors;

(b)    New retailers' need to construct a website and then to advertise through search engines and other means in order to generate traffic;

(c)    Established retailers' can take advantage of economies of scale; and

(d)    Consumers prefer retailers with whom they are already familiar.

255.    To lower these barriers to entry, many online retailers use a TPOM rather than the more traditional e-commerce approach involving a separate website for an individual retailer.

256.    A traditional e-commerce website allows purchases of that retailer's products only and is analogous to a brick-and-mortar store that sells one retailer's inventory exclusively (e.g., www.dicksportinggoods.com and a Dick's Sporting Goods physical store).

257.    A TPOM, by contrast, is analogous to a farmer's market or bazaar where a single location hosts multiple independent sellers, who often offer the same or very similar products and compete on the basis of price or quality. In exchange for providing a platform for sales, a

57

CLASS ACTION COMPLAINT
CASE NO.

TPOM takes a commission from third-party retailers' sales (and may charge other fees as well). Familiar TPOMs include the Amazon Marketplace, eBay, and Walmart.com.

258.    Some websites, such as Amazon.com, include both traditional retail (where Amazon itself sells products to consumers) and a TPOM (where third parties sell products to consumers using Amazon's platform).

259.    TPOMs offer various advantages to third-party retailers. They reduce transaction and start-up costs by allowing sellers to piggyback on the brand recognition and traffic of the marketplace site, thereby eliminating the need to design and to drive traffic to individual e-commerce platforms. This advantage is particularly great for retailers that sell products that are identical or very similar to those sold by many other retailers.

260.    TPOMs also feature centralized payment processing, thereby providing shoppers with security when providing their financial information online and eliminating the need for third-party sellers to create and maintain a secure portal for internet purchases. Due to this central processing, on most TPOMs, a buyer may select items from one or many different sellers and yet combine all the items into a single purchase.

261.    Businesses operating on the Amazon Marketplace also benefit from Amazon's consumer- and transaction-focused tools, which include credit card processing, product return, anti-theft and other security technologies, efficiency enhancement, and order- and inventory-tracking features.

262.    For an additional fee, some TPOMs, like the Amazon Marketplace, will fulfill orders. Order fulfillment services allow third-party sellers to store their products at the TPOM's warehouses from which the TPOM will ship the product to the customer. This benefit further reduces barriers to entry by allowing smaller retailers to take advantage of the lower cost of fulfillment services that the TPOM's economies of scale make possible.

263.    In addition, in many circumstances, Amazon's order- and inventory-tracking technologies communicate and integrate with those used internally by small businesses. This

CLASS ACTION COMPLAINT
CASE NO.

integration facilitates orders and prevents inadvertent sales in excess of the business's current inventory.

264.    Taken together, these features increase access to customers and reduce transaction costs, thereby allowing small retailers (and the distributors and manufacturers who supply them) to compete against larger enterprises to consumers' ultimate benefit. TPOMs like the Amazon Marketplace are often the primary (if not the sole) source of revenue for many of Defendants' competitors in the online market for NFL Licensed Products.

### 2.    NFL Licensed Products vs. Other Products.

265.    Products bearing the logo of an NFL Team are distinct from products that do not carry such a logo. Consumers purchase a licensed sports product not because they value the object bearing the logo itself, but rather because they want to own, wear, or use an object that displays their loyalty to an NFL Team or athlete.

266.    Defendants, particularly Fanatics, acknowledge this fact and have repeatedly referred to the "licensed sports merchandise" industry when discussing the NFL Licensed Products market in which they compete.[74] Indeed, industry participants track economic and financial statistics about the market for NFL Licensed Products separate and apart from those tracked for other types of licensed or unlicensed products.

267.    Because consumers purchase NFL Licensed Products in large part to express their loyalty to NFL Teams, similar items bearing other sorts of logos are not reasonable substitutes nor are the same items without logos.

268.    The NFL has a fan base that is distinct from those of non-NFL professional football teams, amateur football teams, other professional and amateur sports, and other sorts of fandoms.

269.    The NFL dominates the professional football market. While there are other professional football leagues such as the Arena Football League ("AFL") and the Indoor Football

---

[74] *See, e.g.*, *Why Shop With Us?*, *supra*.

CLASS ACTION COMPLAINT
CASE NO.

League ("IFL"), teams in these leagues play a substantially different sport—indoor football—with a discrete fan base. The AFL has been significantly less successful than the NFL, having had to cancel its 2010 season and then dissolving the league and filing for bankruptcy in 2019. To further distinguish itself from the NFL, the AFL played its games in the spring and summer rather than the fall.

270.    Other leagues that attempted to compete directly with the NFL have failed to attract the sort of interest and fan loyalty characteristic of the market for NFL Licensed Products. The Alliance of American Football operated for less than a single season in 2019. The XFL operated for a single season in 2001, then restarted in 2020 before declaring bankruptcy. While it plans to resume play for the 2023 season, the XFL's failure to complete a full season since 2001, its significantly smaller size (8 teams), and its modified rules render any licensed products bearing the logos of its teams part of a market distinct from that for NFL Licensed Products. Moreover, the NFL's product is vastly superior from consumers' perspective as it features the best players, coaches, and viewing experience.

271.    The market for NFL Licensed Products is distinct from the market for licensed sports products associated with amateur (particularly collegiate) football. In particular, while many fans feel that they can only have one favorite NFL Team at a time (though they may switch allegiances), there is no obstacle to being a fan of an NFL Team and a college team at the same time as the two types of teams never compete head-to-head. This ability to have parallel fandoms is facilitated by a schedule whereby college football is typically played on Saturdays while the NFL plays on Sundays (and occasional weeknights). College football broadcasts form a market independent from other football broadcasts because the college football audience is uniquely attractive to advertisers.

272.    The market for NFL Licensed Products is also distinct from that for licensed sports products from other professional sports leagues. This should come as little surprise as other sports leagues play different sports at different times of year in different venues. Because

60

the purpose of buying a Licensed Sports Product is to express loyalty to the Team whose logo appears on the product, apparel featuring logos of teams from other sports is no substitute.

273.   Finally, the market for NFL Licensed Products is distinct from that for licensed products representing other fandoms. Although an individual may certainly be both a fan of NFL football and a fan of DC Comics, such an individual would still not consider a T-shirt with Batman's iconic batwing logo an appropriate substitute for one bearing the Dallas Cowboys' equally iconic blue star. The licensed products would be worn to express different loyalties and potentially at different times and places to elicit approving reactions from different sorts of people.

### 3.   New vs. Vintage.

274.   The relevant market is limited to new products. The market for new NFL Licensed Products is distinct from the market for vintage NFL Licensed Products. Vintage NFL Licensed Products are sold by different types of sellers through different outlets. For instance, vintage sports memorabilia, particularly if it is valuable or rare, is often sold at auction or by private sale rather than through retail outlets. Even retailers that sell both new and vintage NFL Licensed Products tend to display them separately in both brick-and-mortar and online stores rather than mixing the two types of products together. Fanatics itself reflects this trend as it maintains separate websites for new licensed sports products (e.g., Fanatics.com) and collectibles and memorabilia (e.g., FanaticsAuthentic.com and SportsMemorabilia.com). The pricing structure also tends to differ; prices for products associated with current athletes tend not to vary substantially with the athlete's identity, while the price of vintage products heavily depends on the rarity and age of the product as well as on the popularity of the player appearing on the product. Thus, for example, a signed Joe Montana football sells for $446.99 on SportsMemorabilia.com while an Isiah Pead football sells for only $97.99. Consumers also treat the two types of products quite differently, indicating that they are not interchangeable. For instance, a fan might purchase a new jersey bearing the name

61

CLASS ACTION COMPLAINT
CASE NO.

1  of a favorite player to wear in everyday life but would be unlikely to ever wear a costly vintage

2  jersey.

3  **B.      Competition Amongst Defendants.**

4  275.    The Teams recognize that they compete with one another for sales of NFL

5  Licensed Products. For instance, in 1996 the Dallas Cowboys sued the NFL and its competitor-

6  teams, alleging that the NFL's then-existing licensing rules eliminated competition in the

7  professional football sponsorship and merchandise markets and violated antitrust laws.

8  276.    This competition is most fierce in areas of the country where there is no "local"

9  team. In those areas, Teams with a large national following (like the Dallas Cowboys, New

10 England Patriots, or Pittsburgh Steelers) compete for sales and fan loyalty both with each other

11 and with other Teams seeking to grow national fan bases. Competition between Teams also

12 exists in areas with multiple "local" Teams (e.g., the Los Angeles Rams and the Los Angeles

13 Chargers or the Washington Football Team and the Baltimore Ravens).

14 277.    The Teams also compete for purchases and support from "new" football fans; that

15 is, those persons who were not previously fans of NFL football. This is a main reason, for

16 example, that the NFL now hosts regular season games, played by a rotating set of teams, in

17 international locations such as London and Mexico City that lack a history of exposure to

18 American football.

19 278.    Professional football fans are often fans of Teams other than their current "home"

20 team (i.e., the Team whose home stadium is in closest proximity). For example, it is not

21 uncommon for a professional football fan to start out as a fan of her home team, switch to

22 following a second team based on an affinity with a favorite player, and/or become a fan of a

23 third team if or when the fan moves to a different city (or marries a fan of another team).

24 279.    The expansion of NFL television programming reflects the geographic dispersal

25 of fans for even "local" teams. Traditionally, networks and even basic cable channels determined

26 which NFL games to broadcast to which viewers based on geography (e.g., the Northeast might

27

28 CLASS ACTION COMPLAINT
CASE NO.

get a New England Patriots game while the Northwest might get a Seattle Seahawks game being played at the same time). However, providers have begun to offer packages such as DirecTV's "Sunday Ticket" that allow fans to view games played by Teams throughout the country. If NFL fandom were not a nationwide phenomenon that transcends geography, there would be no consumer support for these packages.

280.    In short, the Teams compete for fan purchases both in their "home" markets and across the country (and beyond) and from both new and existing fans. The growth of online shopping increases the intensity and importance of this competition as fans can easily purchase NFL Licensed Products bearing the logo of any Team from anywhere else in the country.

281.    Additionally, the Teams are horizontal competitors of Fanatics for the sale of NFL Licensed Products through online stores. Each team owns a domain name for an online store, and Fanatics sells NFL Licensed Products through several online stores. In a competitive market, the Teams and Fanatics would compete to sell merchandise. However, as described below, most of the Teams have ceded control of their online store to Fanatics, eliminating competition.

**C.    Defendants Dominate the Market for Online Sales of New NFL Licensed Products.**

282.    Fanatics, the NFL, and the Teams collectively dominate the online retail market for NFL Licensed Products. Within the online retail market for NFL Licensed Products in the United States, Defendants possessed and exercised the power to profitably increase prices and restrict output in the market through their control of licensees and online retail domains. As Rubin describes it, "[c]ollectively, the [major sports] leagues have one of the most successful direct-to-consumer businesses of any brands in the world and so many other industries and so

CLASS ACTION COMPLAINT
CASE NO.

many other companies aspire to have the kind of market share online that the leagues are doing in their partnership with us today."[75]

283.    In 2011, Rubin acquired Fanatics, which now has relationships with over 1,080 product vendors. Fanatics offers NFL Licensed Products through its Fanatics and FansEdge websites. Fanatics currently operates over 300 online and offline stores, including the e-commerce websites of major professional sports leagues (MLB, NASCAR, NBA, NFL, NHL, PGA, MLS, and UFC), major media brands (CBS Sports, Fox Sports, and NBC Sports), and over 150 collegiate and professional team properties.

284.    Around May 2017, the NFL acquired an equity stake in Fanatics for $95 million. Since then, the NFL's favoritism towards Fanatics has allowed its valuation and market strength to balloon. Fanatics was valued at $6.2 billion in August 2020 after raising $350 million in a private funding round. Fanatics raised $320 million in additional funding in early 2021, increasing its valuation to $12.8 billion.[76] In August 2021, Fanatics secured an additional $325 million and is now valued at $18 billion.[77]

---

[75] *Fanatics Aiming for $10 Billion in Sales*, SGB Media (Sept. 14, 2017), https://sgbonline.com/fanatics-aiming-for-10-billion-in-sales/.

[76] Jabari Young, *Fanatics Valuation Doubles to $12.8 Billion After New Funding Round*, CNBC (March 24, 2021), https://www.cnbc.com/2021/03/24/fanatics-valuation-doubles-to-12point8-billion-after-new-funding-round.html.

[77] Jabari Young, *Sports Merchandise Company Fanatics Now Valued at $18 Billion with New Investors Including Hip-Hop Mogul Jay-Z*, CNBC (Aug. 10, 2021), https://www.cnbc.com/2021/08/10/fanatics-valued-at-18-billion-with-new-investors-including-jay-z-.html.

CLASS ACTION COMPLAINT
CASE NO.

285.    In 2020, approximately 82% of Fanatics business was direct-to-consumer, and 90% of that was e-commerce (i.e., purchased online).[78] That same year, Fanatics sold approximately $1 billion in NFL Licensed Products.[79]

286.    In December 2020, Fanatics purchased WinCraft, Inc., a supplier and wholesaler/licensee of NFL Licensed Products focusing mainly on "hardgoods" such as flags, banners, wall art, pennants, decals, and lanyards.[80] At that time, WinCraft generated $100 million in annual revenue, employed a staff of over 500, and held client relationships with all North America's major leagues and teams.[81]

287.    Due in part to such acquisitions, Fanatics' e-commerce sales are up 30% year-over-year and are expected to be over $3 billion for 2021.[82]

288.    Upon information and belief, Fanatics' share of the online market for NFL Licensed Products has been over 50% since 2017. Fanatics' market power is recognized by industry observers. For instance, *Sportico* reported that Fanatics "has more or less cornered the industry."[83] Similarly, it has become a trope to call Fanatics the "Amazon of sports apparel,"

---

[78] *See Fanatics's Michael Rubin on the Company's $6.2 Billion Valuation and Growth Despite Pandemic*, CNBC: Squawk Box (Aug. 14, 2020), https://www.cnbc.com/video/2020/08/14/fanaticss-michael-rubin-on-the-companys-6-point-2-billion-valuation-and-growth-despite-pandemic.html.

[79] Mike Ozanian, *Michael Rubin Dishes on His Evolving Game Plan for Fanatics and Life*, Forbes (Sept. 30, 2020), https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=76bf987c1147.

[80] *See Fanatics's Michael Rubin on the Company's $6.2 Billion Valuation and Growth Despite Pandemic*, CNBC: Squawk Box (Aug. 14, 2020), https://www.cnbc.com/video/2020/08/14/fanaticss-michael-rubin-on-the-companys-6-point-2-billion-valuation-and-growth-despite-pandemic.html. *See* CNBC: Squawk Box (Aug. 14, 2020), *supra*.

[81] Sam Carp, *Fanatics Strengthens Non-Apparel Offering with WinCraft Acquisition*, Sports Pro Media (Dec. 8, 2020), https://www.sportspromedia.com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel/.

[82] Young, *Fanatics Valuation Doubles*, *supra*.

[83] Eben Novy-Williams, *NFL, Amazon Are Bringing Thousands of New Products to Retail Giant*, Yahoo: Sportico (Mar. 24, 2021), https://www.yahoo.com/now/nfl-amazon-bringing-thousands-products-200037755.html.

CLASS ACTION COMPLAINT
CASE NO.

analogizing Fanatics' dominance of the market for licensed sports products to Amazon's dominance of online retail.[84]

289.     By itself, Fanatics' market share is sufficient to infer market power in the relevant market. When combined with the NFL Defendants' additional market share, it is not difficult to see that Defendants control the vast majority of the online market for NFL Licensed Products.

290.     Defendants' market power gives them the ability to exclude other competitors. Defendants demonstrated their actual market power by prohibiting licensees from selling to retailers operating on TPOMs and thus competing with Defendants' own retail operations. This power is especially noticeable because Defendants used it to restrain not only licensees' future sales but also the ultimate retail sale of NFL Licensed Products that licensees had already sold to distributors and retailers without these restrictions. Defendants stunted the growth and effectuated the removal of scores of smaller retailers and millions of dollars in NFL Licensed Products from consumers' most visited online shopping destinations.

291.     Defendants' power to exclude is also demonstrated by rising prices. Before 2016, online retail prices for NFL Licensed Products were trending steadily downward. Since 2017, however, prices have reversed course and have increased each year as Defendants' anticompetitive conduct has allowed them to charge consumers ever higher supracompetitive prices. For example, a Fanatics-branded Super Bowl Champion Locker Room T-Shirt that cost $27.99 in 2017 now costs $37.99.

292.     Fanatics' market power is also evident in shipping charges. Companies compete to offer lower shipping costs at increased speeds. As one survey found, 82% of consumers prefer

---

[84] Jon Wertheim, *Fulfilling Fanatic*, Sports Illustrated (Jan. 5, 2021), https://www.si.com/nba/2021/01/05/michael-rubin-fanatics-nba-owner; *see* Kendall Baker, *Fanatics Is Dominating the Sports Apparel Market*, Axios (May 20, 2019), https://www.axios.com/fanatics-sports-apparel-retail-a924fe76-5f9a-4b49-9db3-88d0c6897958.html ("Fanatics is to sports apparel what Amazon is to, well, everything else.").

CLASS ACTION COMPLAINT
CASE NO.

free shipping to paying a fee to have their shipments expedited.[85] Despite consumers' preference, Fanatics charged customers as much as $8.19 (or more) if they want standard shipping for a lightweight t-shirt bought on Amazon and $14.99 for two-day shipping for a t-shirt purchased on Fanatics.com. In contrast, TPOMs often prioritize resellers that offer little to no shipping fees.[86]

293.    Although Fanatics' financial data is not public, further discovery is likely to show that Fanatics' profit margins on NFL Licensed Products increased once the conspiracy began to take effect.

## X.    INJUNCTIVE RELIEF IS APPROPRIATE TO RESTORE COMPETITION TO THE MARKETPLACE.

294.    The collusive behavior described in this Complaint is likely to cause continued imminent harm to competition in the online retail market for NFL Licensed Products by eliminating competitors and forcing Plaintiffs and the members of the Class to continue to pay the anticompetitive overcharges enabled by Defendants' scheme.

295.    Section 16 of the Clayton Act, 15 U.S.C. § 26, permits a court to award injunctive relief to a private Plaintiffs who prove an antitrust violation. Accordingly, Plaintiffs and the members of the Class seek equitable and injunctive relief, including a declaratory judgment that Defendants' boycott of competing retailers who sell NFL Licensed Products on TPOMs violates antitrust laws.

296.    Specifically, Plaintiffs seek an injunction prohibiting Defendants from preventing their licensees from selling their products to distributors or retailers who make those products available on TPOMs, prohibiting Fanatics from conditioning its purchases on manufacturers agreement to refuse to sell NFL Licensed Products to competing retailers that sell primarily

---

[85] George Anderson, *Consumers hate paying for shipping more than just about anything*, RetailWire (Feb. 20, 2020), https://www.retailwire.com/discussion/consumers-hate-paying-for-shipping-more-than-just-about-anything/.
[86] Amanda Mull, Stop Believing in Free Shipping, The Atlantic (Jan. 2020), https://www.theatlantic.com/magazine/archive/2020/01/the-myth-of-free-shipping/603031/ (noting that Etsy changed its search algorithm to give priority to sellers who guarantee free shipping, and that sellers absorb the cost of free shipping).

CLASS ACTION COMPLAINT
CASE NO.

1   online, and prohibiting Defendants from preventing competing retailers from using NFL-related

2   keywords to describe or advertise their products online.

3       297.    Plaintiffs and the members of the Class seek monetary damages to compensate

4   them for the overcharges they sustained in purchasing NFL Licensed Products during the

5   conspiracy period. However, Plaintiffs and the members of the Class are reasonably likely to

6   purchase additional NFL Licensed Products in the near future. Unless and until Defendants are

7   enjoined from continuing their anticompetitive conduct, Plaintiffs and the members of the Class

8   are reasonably likely to continue to suffer imminent harm.

9       298.    Indeed, because a finding of Defendants' liability for money damages depends

10  upon a finding that Defendants' conspiracy is unlawful, it would be unreasonable to allow

11  Defendants to continue that conduct.

12  **XI.    STATUTES OF LIMITATION ARE TOLLED.**

13      **A.    Discovery Rule.**

14      299.    Plaintiffs and the members of the Class did not discover and could not have

15  discovered through the exercise of reasonable diligence that Defendants engaged in their

16  anticompetitive conspiracy.

17      300.    Defendants and their employees regularly interact both in person at various social

18  gatherings, and industry or trade association meetings and remotely through company and

19  personal email, personal and company phone calls, and text messages. These communications

20  provide them with ample opportunity to conspire without detection. For example, Rubin

21  privately communicates daily with influential NFL owner Robert Kraft.

22      301.    There is no conceivable way Plaintiffs or the members of the Class, through the

23  exercise of reasonable diligence, could have gained knowledge of conspiratorial conduct

24  undertaken through non-public business email, personal email, text messages, or phone

25  conversations.

26

27

28
                                          68
CLASS ACTION COMPLAINT
CASE NO.

302.    Any statutes of limitation otherwise applicable to any claims asserted in this Complaint have thus been tolled by the discovery rule.

**B.    Fraudulent Concealment**

303.    All applicable statutes of limitation have been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged in this Complaint.

304.    Defendants made numerous fraudulent statements to create the false appearance of competition and to conceal the existence of their conspiracy. For example:

(a)    The NFL Defendants hide from the public the fact that the No TPOM Sellers Policy is only enforced against certain retailers, *i.e.*, those who are not members of the conspiracy;

(b)    Rubin has publicly stated that products like what Fanatics sells cannot be found on TPOMs like the Amazon Marketplace because those products are "unique." In truth, similar products were not available on the Amazon Marketplace (until Fanatics' recent deal with Amazon) or other TPOMs because of Defendants' conspiracy;

(c)    The NFL Defendants' representation that restrictive licensing agreements are necessary to prevent the sale of counterfeit or unlicensed items concealed the anticompetitive intent of the No TPOM Sellers Agreements behind a façade of concern for protecting valuable intellectual property; and

(d)    Defendants impose anticompetitive agreements on smaller co-competitors that include, among other restrictive provisions, requirements that the individual counterparty keep the existence and terms of the agreement strictly confidential.

305.    Defendants were motivated to keep their conduct secret because, if exposed, it not only could have led to governmental investigations and private lawsuits (like this one), but also would have diminished Defendants' reputation, harmed the value of their respected brands, and impaired their ability to extract premiums based on that reputation.

CLASS ACTION COMPLAINT
CASE NO.

306.    The No NFL Keywords Policy is, in fact, self-concealing as the operation of the policy means that consumers cannot acquire knowledge that competing retailers are even offering NFL Licensed Products for sale.

307.    Plaintiffs had no knowledge of, nor any reason to suspect the existence of, the conspiracy because Defendants affirmatively concealed its existence. Defendants enforced the conspiracy through business communications among themselves and with licensees of NFL Licensed Products rather than in publicly accessible statements or actions.

308.    Plaintiffs, as consumers, would have no reason to even suspect the existence of an anticompetitive agreement lying behind the No TPOM Sellers, the No Online Retailers, and the No NFL Keywords Policies.

309.    Plaintiffs diligently investigated their claims. Because the information regarding Fanatics' central role was not publicly available, it was only upon obtaining access to non-public information from manufacturers and distributors affected by the No TPOM Sellers Agreement that Plaintiffs had sufficient information to initiate this suit.

310.    Defendants did not disclose their misconduct and, in fact, actively concealed it.

311.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged in this Complaint.

## XII.    COUNT ONE: VIOLATION OF SHERMAN ACT § 1 AND THE CLAYTON ACT.

312.    Plaintiffs and the members of the Class hereby incorporate each preceding and succeeding paragraph as though fully set forth in this Complaint.

313.    Beginning at a time presently unknown to Plaintiffs and the members of the Class, but at least as early as the NFL's purchase of an equity stake in Fanatics and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 12, *et seq*.

CLASS ACTION COMPLAINT
CASE NO.

314.     Defendants have engaged in one overarching anticompetitive conspiracy that has at least four relevant components: *First*, Defendants colluded to boycott competing retailers who sell NFL Licensed Products through TPOMs. Defendants' conduct successfully eliminated competitors who would have charged lower prices for NFL Licensed Products sold online, thereby removing the downward pressure on prices and margins that would have flowed directly from enhanced competition. *Second*, Fanatics leverages its market power as an online retailer to force its suppliers, who are dependent on Fanatics' purchases, to cut off supply to retailers who compete with Defendants in the online retail market for NFL Licensed Products. *Third*, the NFL Defendants have effectively withdrawn as competitors in the online retail market and instead granted Fanatics' licenses to their online storefronts in return for a share of Fanatics' monopoly profits. *Fourth*, Defendants have prevented competing retails from using keywords to bid on search advertising or to describe their products on the Amazon Marketplace using the terms necessary to enable consumers to find and purchase those products.

315.     The combination and conspiracy alleged in this Complaint has had the following effects, among others:

(a)     Competition in the U.S. market for the online sale of NFL Licensed Products has been restricted;

(b)     Prices for NFL Licensed Products sold online in the United States by Defendants have been set, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

(c)     Plaintiffs and the members of the Class have been deprived of the benefits of free and open competition.

316.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to eliminate competition so that they could set, maintain, raise and/or stabilize prices of NFL Licensed Products sold in the United States

CLASS ACTION COMPLAINT
CASE NO.

and share in the resultant monopoly profits. Each Defendant is a participant in this unlawful contract, combination, or conspiracy.

317.    As a direct and proximate result of Defendants' illegal agreement, contract, combination trust, and/or conspiracy, Plaintiffs and the members of the Class paid more for NFL Licensed Products than they would have paid but for the conspiracy. They have thus been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, Plaintiffs are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

318.    The conduct of Defendants described throughout this Complaint constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

319.    In the alternative, the conduct violates Section 1 under the "rule-of-reason" standard because Defendants' agreements have harmed competition in the United States market for the online retail sale of NFL Licensed Products. The agreements provide no procompetitive benefits, and, even if they did, the agreements' anticompetitive effects substantially outweigh any asserted procompetitive effects and/or were not the least restrictive method to achieve any such procompetitive benefits.

## XIII.   COUNT TWO: VIOLATION OF SHERMAN ACT § 2.

320.    Plaintiffs and the members of the Class hereby incorporate each preceding and succeeding paragraph as though fully set forth in this Complaint.

321.    Beginning at a time presently unknown to Plaintiffs and the members of the Class, but at least as early as the NFL's purchase of an equity stake in Fanatics and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 12, *et seq*.

CLASS ACTION COMPLAINT
CASE NO.

322.    Defendants' conduct allowed them to achieve a monopoly in the market for the online sale of NFL Licensed Products via illegal means and/or represented an unlawful attempt to achieve such monopoly.

323.    Defendants' conduct violates the Sherman Act's prohibitions on monopolizing, attempting to monopolize, and conspiring to monopolize a market using anticompetitive means.

324.    Defendants have engaged in one overarching anticompetitive conspiracy that has at least three relevant components: *First*, Defendants have conspired to boycott competing retailers who sell NFL Licensed Products through third-party online marketplaces. Defendants' conduct has successfully eliminated competitors who would have charged lower prices for NFL Licensed Products sold online, thereby removing the downward pressure on prices and margins that would have flowed directly from enhanced competition. *Second*, Fanatics leverages its market power as an online retailer to force its suppliers, who are dependent on Fanatics' purchases, to cut off supply to other retailers who compete with Defendants in the online retail market for NFL Licensed Products. *Third*, the NFL Defendants have effectively withdrawn as competitors in the online retail market and instead granted Fanatics licenses to their online storefronts in return for a share of Fanatics' monopoly profits. *Fourth*, Defendants have prevented competing retails from using keywords to bid on search advertising or to describe their products on the Amazon Marketplace using the terms necessary to enable consumers to find and purchase those products.

325.    As a direct and proximate result of Defendants' conspiracy, Defendants' conduct injured Plaintiffs and the members of the Class by successfully driving out competitors from the relevant market, enabling Defendants to set and/or maintain prices at artificially high levels. Each Defendant is a participant in this unlawful scheme.

326.    Defendants' conduct constitutes a *per se* violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

CLASS ACTION COMPLAINT
CASE NO.

327.     In the alternative, the conduct violates Section 2 under the "rule-of-reason" standard because Defendants' policies and agreements described in this complaint constitute an unlawful means of obtaining, maintaining, and/or attempting to obtain or maintain a monopoly in the online retail markets for NFL Licensed Products. The agreements provide no procompetitive benefits, and, even if they did, the agreements' anticompetitive effects substantially outweigh any asserted procompetitive effects and/or were not the least restrictive method to achieve any such procompetitive benefits.

328.     As a direct and proximate result of Defendants' illegal agreement, contract, combination trust, and/or conspiracy, Plaintiffs and the members of the Class paid more for NFL Licensed Products than they would have paid but for the conspiracy. Plaintiffs and the members of the Class have therefore been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, Plaintiffs are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## XIV.   COUNT THREE: INJUNCTIVE RELIEF UNDER 15 U.S.C. § 26.

329.     Plaintiffs request that this Court award injunctive relief prohibiting Defendants from enforcing the agreements described herein, which hinder, interfere with, limit, and/or prevent online retailers from selling NFL Licensed Products on TPOMs, from bidding on search terms that use NFL-related keywords, or from using such keywords to describe their offerings of NFL Licensed Products on online retail sites.

330.     Plaintiffs also request that this Court award injunctive relief prohibiting Fanatics from enforcing agreements with manufacturers as described in this Complaint, which hinder, interfere with, limit, and/or prevent competing online retailers from obtaining NFL Licensed Products for resale online.

74

CLASS ACTION COMPLAINT
CASE NO.

331.    Defendants have caused Plaintiffs and the other members of the Class irreparable harm, which cannot be remedied completely by financial compensation. Because Defendants' efforts have denied Plaintiffs the benefit that flow from a free and competitive marketplace, one that benefits from the features, services, technologies, and widespread consumer access associated with competing retailers selling on online and on TPOMs, legal remedies are inadequate, and the requested equitable relief is justified. The nature and format of online retail generally, and TPOMs specifically, allow small businesses to compete against larger enterprises to consumers' ultimate benefit. Further, an injunction is justified as Defendants' conduct, acts, and practices have harmed competition and are designed to monopolize the online retail market for NFL Licensed Sports Products, leading to higher prices, reduced selection, lower quality good, and poorer customer service.

## XV.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and the members of the Class demand a jury trial as to all issues triable by a jury.

*    *    *

WHEREFORE, Plaintiffs and the Class pray that this Court

a.   Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.   Appoint Plaintiffs as the representatives of the Class;

c.   Appoint Plaintiffs' counsel as counsel for the Class;

d.   Adjudge and decree that Defendants' acts are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and the acts done in furtherance of it by Defendants and their co-conspirators be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the members of the Class for treble the amount of damages sustained by them as

CLASS ACTION COMPLAINT
CASE NO.

1    allowed by law, together with costs of the action, including reasonable attorneys'

2    fees, and pre- and post-judgment interest;

3       e.   Adjudge and decree that Defendants' acts are illegal and unlawful, and a violation

4    of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Judgment be entered

5    against Defendants, jointly and severally, and in favor of Plaintiffs and the

6    members of the Class for treble the amount of damages sustained by them as

7    allowed by law, together with costs of the action, including reasonable attorneys'

8    fees, and pre- and post-judgment interest;

9       f.   Permanently enjoin and restrain each of the Defendants, and their respective

10   successors, assigns, parent, subsidiaries, affiliates, and transferees, and their

11   officers, directors, agents, and representatives, and all other persons acting or

12   claiming to act on behalf of Defendants or in concert with them, from, in any

13   manner, directly or indirectly, continuing, maintaining or renewing the

14   combinations, conspiracy, agreement, understanding, or concert of action as

15   alleged in this Complaint; and

16      g.   Award Plaintiffs and the members of the Class such other and further relief as

17   may be necessary and appropriate.

18

19

20

21

22

23

24

25

26

27

28   CLASS ACTION COMPLAINT
     CASE NO.

Dated: February 9, 2022

*/s/ Adam E. Polk*

**BURNS CHAREST LLP**
Christopher J. Cormier
(Pro Hac Vice to be Filed)
Spencer Cox (Pro Hac Vice to be Filed)
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
Fax: (469) 444-5002
ccormier@burnscharest
scox@burnscharest

    -and-

Warren T. Burns (*Pro Hac Vice* to be Filed)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com

    -and-

Patrick Murphree (*Pro Hac Vice* to be Filed)
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Tel: (504) 799-2845
Fax: (504) 881-1765
pmurphree@burnscharest.com

**GIRARD SHARP LLP**
Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
Kyle P. Quackenbush (SBN 322401)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
apolk@girardsharp.com
kquackenbush@girardsharp.com

**ANDREW M. PURDY,**
**ATTORNEY AT LAW**
Andrew M. Purdy (SBN 261912)
amp@purdylegal.com
15615 Alton Parkway
Tel: (949) 570-5500
Fax: (949) 298-7234
amp@purdylegal.com

77

CLASS ACTION COMPLAINT
CASE NO.